CITY OF CRANSTON

v.

RHODE ISLAND LABORERS'
DISTRICT COUNCIL,
LOCAL 1033 et al.

No. 2005–328–Appeal.

Supreme Court of Rhode Island.

Dec. 8, 2008.

Frederic A. Marzilli, East Providence, for Plaintiff.

Donald S. Iannazzi, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

In 2003 the City of Cranston (city) was faced with a fiscal crisis. In the midst of this period of financial distress, Mayor Stephen P. Laffey terminated the employment of each of the city's existing crossing guards in an effort to manage more effectively the city's budget.[1] After losing their jobs, the crossing guards, through their union, Rhode Island Laborers' District Council, on behalf of Public Service Employees' Local Union 1033 (Local 1033), filed a grievance, alleging that this termination violated the parties' collective-bargaining agreement. Although an arbitrator determined that the city violated the collective-bargaining agreement, the Superior Court vacated the arbitrator's decision. Local 1033 timely appealed to this Court. For the reasons set forth in this opinion, we conclude that subsequent events have caused this appeal to become moot, and we therefore decline to address its merits.

---

1. The record reflects that thirteen of the original thirty-nine crossing guards had retired.

# I

## Facts and Travel

The facts of this case are largely undisputed. Since 1991, the city and Local 1033 have negotiated collective-bargaining agreements concerning wages and other terms of employment. The parties entered into a collective-bargaining agreement on July 1, 2001, which was to be effective until June 30, 2004.

Almost one year later, on June 4, 2002, former Mayor John O'Leary and Local 1033 engaged in concession bargaining. They entered into a new collective-bargaining agreement, effective July 1, 2002, through June 30, 2005. This new collective-bargaining agreement differed from its predecessor by (1) eliminating previously secured wage increases, as well as allowances for uniforms, uniform cleaning, and uniform maintenance; and by (2) adding a provision to increase job security. The provision to increase job security, which is the focus of this dispute, took the form of a no-restructuring clause, which provided:

> "[T]he City agrees for the life of this collective bargaining agreement (July 1, 2002 through June 30, 2005), not to lay-off or furlough any bargaining unit member and further agrees to maintain not less than thirty-nine (39) crossing posts staffed by 39 bargaining unit employees. This provision will 'sunset' at the completion of this three (3) year agreement (i.e. June 30, 2005) and the provisions of the prior contract regarding layoffs, furloughs and staffing will be reinstated."

In January 2003, Mr. Laffey became the city's new mayor. In June 2003, during Mayor Laffey's administration, the Cranston City Council (council) adopted a new budget, which provided no funding for the city-run crossing guard program. On July 22, 2003, the city sent out layoff notices to all of the existing crossing guards, informing them that the program had been eliminated.

Two days later, Local 1033 filed a grievance against the city. At around the same time, Local 1033 instituted legal proceedings against the city in Superior Court. It sought an injunction to prevent the city from laying off the crossing guards and to preserve the status quo so that the grievance could proceed toward arbitration. The hearing justice granted a temporary restraining order and later issued a permanent injunction, enjoining the layoffs of the crossing guards until after the arbitrator issued a final and binding award.

Meanwhile, the grievance proceeded to arbitration and, after hearing from both parties, the arbitrator issued an award in favor of Local 1033, concluding that the grievance was arbitrable and that the city had violated the collective-bargaining agreement by laying off the crossing guards.

On June 3, 2004, the city asked the Superior Court to vacate the arbitration award. Local 1033 opposed the city and filed a motion to confirm and enforce the arbitration award. After conducting a hearing, the motion justice vacated the arbitrator's award, ruling that the no-restructuring clause conflicted with the Cranston City Charter (charter), which authorized the mayor to modify or abolish organizational units. The motion justice also concluded that the no-restructuring clause violated public policy in that the charter evinced an intent that the mayor and the council have the authority to protect the financial well-being of the city through the abolishment of organizational units. A judgment vacating the arbitration award was entered on January 18, 2005; Local 1033 timely appealed.

Because the motion justice's decision to vacate the arbitration award occurred in January 2005, only a few months before the end of the 2004–2005 school year, the city allowed the crossing guards to continue in their employment until the end of the school year (June 2005). During this time, the crossing guards continued to work and receive compensation for their services. The collective-bargaining agreement expired on June 30, 2005.

## II

## Analysis

On appeal, Local 1033 contends that the motion justice erred in vacating the arbitrator's award. Local 1033 maintains that the dispute was arbitrable and that the no-restructuring clause did not violate the charter provisions allowing the mayor and council to abolish organizational units. They further argue that the city cannot act inconsistently with its own contractual obligations. The city, on the other hand, asserts that the motion justice properly vacated the arbitrator's award. The city contends that, because the charter has the force and effect of state law, it prevails over any conflicting no-restructuring clause. According to the city, this renders the dispute non-arbitrable. The city alternatively contends that the no-restructuring clause was unenforceable as against public policy.

### A

### Standard of Review

In reviewing an arbitration award, this Court, like the Superior Court, follows G.L. 1956 § 28–9–18(a), which requires a

vacation of an arbitration award in three instances: (1) "When the award was procured by fraud"; (2) "[W]here the arbitrator or arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award upon the subject matter submitted was not made"; and (3) "[I]f there was no valid submission or contract, and the objection has been raised under the conditions set forth in § 28–9–13." *See City of East Providence v. United Steelworkers of America, Local 15509,* 925 A.2d 246, 252 (R.I.2007). We have held that an arbitrator exceeds his or her powers "by resolving a non-arbitrable dispute." *Woonsocket Teachers' Guild, Local 951, AFT v. Woonsocket School Committee,* 770 A.2d 834, 837 (R.I.2001).

■ Thus, when examining an arbitration award, a "preliminary issue for a reviewing court must be whether the parties derive from the contract an arbitrable grievance." *Rhode Island Court Reporters Alliance v. State,* 591 A.2d 376, 378 (R.I.1991) (citing *United Steelworkers of America v. American Manufacturing Co.,* 363 U.S. 564, 570–71, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960) (Brennan, J., concurring)). Whether that preliminary issue "is arbitrable is a question of law to be reviewed by the [C]ourt *de novo.*" *State v. Rhode Island Alliance of Social Services Employees, Local 580, SEIU,* 747 A.2d 465, 468 (R.I.2000) (quoting *Rhode Island Council 94, AFSCME, AFL–CIO v. State,* 714 A.2d 584, 588 n. 2 (R.I.1998)).

■ Upon determining that an issue is arbitrable, the Court then must examine the arbitration award.[2] We conduct this review deferentially, upholding an award

---

2. If the dispute is non-arbitrable, the award must be vacated in accordance with G.L. 1956 § 28–9–18(a)(2), which provides, in pertinent part, "(a) In any of the following cases the court must make an order vacating the award, upon the application of any party to the controversy which was arbitrated: * * * (2) Where the arbitrator or arbitrators exceeded their powers * * *."

"absent a manifest disregard of a contractual provision or a completely irrational result * * *." *Providence Teachers Union v. Providence School Board,* 725 A.2d 282, 283 (R.I.1999) (quoting *Rhode Island Brotherhood of Correctional Officers v. State Department of Corrections,* 707 A.2d 1229, 1234 (R.I.1998)). "A manifest disregard of the law occurs when an arbitrator understands and correctly articulates the law, but then proceeds to disregard it." *North Providence School Committee v. The North Providence Federation of Teachers, Local 920, American Federation of Teachers,* 945 A.2d 339, 344 (R.I.2008) (citing *Purvis Systems, Inc. v. American Systems Corp.,* 788 A.2d 1112, 1115 (R.I. 2002)).

## B

### Mootness

■■■ Although neither party directly has raised the issue, this Court first must address the threshold issue of justiciability before we may entertain the merits of the parties' substantive arguments. This Court long has recognized the need, apart from certain exceptional circumstances, to confine judicial review only to those cases that present a ripe case or controversy. *State v. Lead Industries Association, Inc.,* 898 A.2d 1234, 1238 (R.I.2006) (citing *G & D Taylor & Co. v. R.G. & J.T. Place,* 4 R.I. 324, 337 (1856) ("Indeed, laws and courts have their origin in the necessity of rules and means to enforce them, to be applied to cases and controversies within their jurisdiction; and our whole idea of judicial power is, the power of the [courts] to apply the [laws] to the decision of those cases and controversies.")). If this Court's judgment would fail to have a practical effect on the existing controversy, the question is moot, and we will not render an opinion on the matter. *See Morris v. D'Amario,* 416 A.2d 137, 139 (R.I.1980) ("As a general

rule we only consider cases involving issues in dispute; we shall not address moot, abstract, academic, or hypothetical questions.").

■■■ We also have held that "[a] case is moot if it raised a justiciable controversy at the time the complaint was filed, but events occurring after the filing have deprived the litigant of an ongoing stake in the controversy." *Seibert v. Clark,* 619 A.2d 1108, 1110 (R.I.1993). *See also Pelland v. State,* 919 A.2d 373, 378 (R.I.2007); *In re New England Gas Co.,* 842 A.2d 545, 554 (R.I.2004) (concluding that because the underlying labor dispute had settled, New England Gas no longer had a continuing stake in the controversy, thereby rendering the case moot); *Associated Builders & Contractors of Rhode Island, Inc. v. City of Providence,* 754 A.2d 89, 91 (R.I.2000) (holding that the plaintiffs' claim was moot because the construction project, which was the subject of the dispute, had been completed).

■■■ One narrow exception to the mootness doctrine exists for those cases that are "of extreme public importance, which [are] capable of repetition but which [evade] review." *Arnold v. Lebel,* 941 A.2d 813, 819 (R.I.2007) (quoting *Morris,* 416 A.2d at 139). "Although we generally refrain from addressing issues that the case at hand does not require us to address, there are occasions when we deem it jurisprudentially sound to provide guidance with respect to an issue that 'is bound to resurface' at some future point in time." *State v. Lead Industries Association, Inc.,* 951 A.2d 428, 470 (R.I.2008) (quoting *Splendorio v. Bilray Demolition Co.,* 682 A.2d 461, 464 (R.I.1996)). For a matter to be deemed of extreme public importance, it will usually implicate "important constitutional rights, matters concerning a person's livelihood, or matters concerning citi-

zen voting rights." *Cicilline v. Almond,* 809 A.2d 1101, 1106 (R.I.2002) (quoting *Associated Builders & Contractors of Rhode Island, Inc.,* 754 A.2d at 91). This Court will exercise its discretion in determining if a matter raised on appeal is of such importance. *See In re Paula G.,* 672 A.2d 872, 874 (R.I.1996).

When this case was heard by the motion justice, a live case or controversy then existed. Members of Local 1033 had been laid off by the city, and the city was seeking to vacate the arbitrator's award in favor of Local 1033, which would result in the permanent termination of the crossing guards. The motion justice ruled in favor of the city, holding that the no-restructuring clause was void. Yet one very important event occurred while this appeal was pending that significantly affects how we shall deal with this case: on June 30, 2005, more than three years before we heard the oral arguments in this matter, the no-restructuring clause in the parties' collective-bargaining agreement expired. As such, the parties will not be affected by a decision about the validity *vel non* of the no-restructuring clause.

The no-restructuring clause provided that the crossing guards' bargained-for job security would "sunset at the completion of this * * * agreement * * *." In other words, any job security promised to Local 1033 would end naturally on June 30, 2005. Indeed, the crossing guards were employed until the end of the 2004–2005 school year and were paid for their services until the no-restructuring clause expired. Although the city could have let the crossing guards go as early as January 2005, based on the motion justice's ruling, the city retained and paid the crossing guards until the school year ended. Because the crossing guards remained em-

ployed by the city for as long as the city was required to retain them, Local 1033 cannot rightfully contend that its members suffered a loss as a result of the motion justice's vacation of the arbitration award. Regardless of the motion justice's decision in favor of the city, the terms in the no-restructuring clause would have concluded at the end of June. Accordingly, because the no-restructuring clause in the collective-bargaining agreement at issue did expire, the provision no longer is applicable and the instant matter does not present a live case or controversy.

In an analogous scenario, in *Sullivan v. Chafee,* 703 A.2d 748, 749 (R.I.1997), the Warwick City Council and the mayor of Warwick sought a declaratory judgment over a dispute concerning the interpretation of budgetary provisions contained in the city charter. The issue concerned the operative tax for the 1997 fiscal year. *Id.* at 753. In reviewing the matter, this Court concluded that the issue "is now a moot question because the 1997 fiscal year has concluded and plaintiffs are no longer seeking a ruling that would invalidate that particular budget and tax rate."[3] *Id.* Later events, namely the expiration of the 1997 fiscal year, deprived the litigants of an ongoing personal stake in the controversy. *Id.*

The facts in *Town of Scituate v. Scituate Teachers' Association,* 110 R.I. 679, 680, 296 A.2d 466, 467 (1972), are even more analogous. The Scituate Teachers' Association and the School Committee of the Town of Scituate entered into a two-year collective-bargaining agreement. *Id.* One provision of the collective-bargaining agreement provided that the teachers' salaries for the second year were subject to renegotiation. *Id.* Pursuant to the con-

---

**3.** Warwick's fiscal year ended in June 1997. The Supreme Court issued its opinion in No-vember 1997. *Sullivan v. Chafee,* 703 A.2d 748, 749 (R.I.1997).

tract terms, the salaries subsequently were revised. *Id.* Shortly thereafter, the town's budget was decreased substantially and the town was unable to provide the agreed-upon second-year salaries. *Id.* The school committee then asked the trial justice for a judicial declaration of whether the collective-bargaining agreement was binding despite the new financial constraints. *Id.* at 682, 296 A.2d at 468. After the trial justice denied declaratory relief, the school committee appealed to this Court. *Id.* at 682–83, 296 A.2d at 468.

By the time this Court heard the appeal, the circumstances surrounding the parties' dispute had changed. The two-year collective-bargaining agreement had expired and a financial town meeting had been held subsequent to the entry of judgment, providing additional funds to the committee. *Town of Scituate,* 110 R.I. at 683, 296 A.2d at 468–69. Due to these changes, we determined that what had been a live case or controversy at the trial level effectively had become a moot question at the appellate level. *Id.* at 684, 296 A.2d at 469. Accordingly, we declined to address the merits of the parties' appeal. *Id.*

In the instant matter, we are presented with a question concerning a long-since-expired term in the parties' collective-bargaining agreement. If we were to answer the question about whether the charter trumps the collective-bargaining agreement's no-restructuring clause, our decision would not affect the parties before this Court because the no-restructuring clause terminated by its own conditions, on June 30, 2005. In *Sullivan,* we declined to address the implications of a charter provision on a budget pertaining to a fiscal year that had ended; and in *Town of Scituate,* we did not address the substantive legal issue concerning a collective-bargaining agreement that had expired before the appeal. Here, the crossing guards' right

not to be terminated expired several years ago. Despite the motion justice's January 2005 order to vacate the arbitration award and terminate the crossing guards, the actual termination occurred at the natural expiration of the no-restructuring clause— June 30, 2005. Until their eventual dismissal, the crossing guards were paid for their services. Furthermore, the parties informed the Court, during oral arguments, that they currently are engaged in negotiations for a new contract between Local 1033 and the city. Thus, as we noted in *Town of Scituate,* "we are being asked to determine an abstract question which neither rests upon existing facts or rights, nor presents an actual and present case." *Town of Scituate,* 110 R.I. at 684, 296 A.2d at 469. The issue before us, therefore, is moot.

It is important to note that the motion justice ruled only on the validity of the no-restructuring clause. The motion justice did not consider the entire collective-bargaining agreement, but solely a provision within the agreement. The other provisions of the collective-bargaining agreement, and the collective-bargaining agreement as a whole, are not before us. This Court has been asked to determine whether the motion justice erred in voiding the no-restructuring clause. In considering the no-restructuring clause, we conclude that it expired by its own terms, on June 30, 2005, thereby rendering that question moot.

The dissent disagrees with our determination of mootness and argues at length that Local 1033 has a continuing stake in this collective-bargaining agreement. Notwithstanding, we have been advised at oral argument that the question of the continued viability of the collective-bargaining agreement at issue currently is before the Rhode Island Labor Relations Board. Therefore, this Court takes no position on

the merits of that controversy, and nothing in this opinion should be construed otherwise.

■ We turn next to the exception to the mootness doctrine. Although a similar *legal* question possibly may arise in the future concerning a conflict between a city charter and the provisions of a collective-bargaining agreement, we cannot conclude that this particular *factual* scenario is one that is capable of repetition but which evades review.

In *Sullivan*, we concluded that the factual situation, a dispute over the interpretation of a budgetary provision, was not necessarily one that was "likely both to recur and yet to evade judicial review." *Sullivan*, 703 A.2d at 753. We explained that it did not fall within the mootness exception because not only could the charter be amended to remedy any ambiguity, but this was the only instance under that particular charter in which the parties had resorted to litigation to resolve a dispute. *Id.* In *Town of Scituate*, 110 R.I. at 683–84, 296 A.2d at 468–69, a principal reason the matter was dismissed as moot was because the parties' collective-bargaining agreement had expired. The instant matter presents a substantially similar scenario.

Quite recently the United States District Court for the District of Rhode Island ruled that a political election period was so inherently short that violations therein always would be capable of repetition, yet would evade review. *Driver v. Town of Richmond ex rel. Krugman,* 570 F.Supp.2d 269, 274 (D.R.I.2008). The three-year term of a collective-bargaining agreement, however, is not of such an "inherently brief duration" that it would

"almost invariably be too short to enable full litigation on the merits." *Id.* (quoting *Caruso v. Yamhill County ex rel. County Commissioner,* 422 F.3d 848, 853 (9th Cir. 2005)).

The substantive legal issues involved in the instant case one day may be appropriately before this Court, but until that time, we will not grapple with those issues. Indeed, "we have been loath to relax the rule insisting upon an actual, justiciable controversy in situations in which the subject matter of a case merely relates to ordinary contract disputes * * * or to the binding effect of a collective bargaining agreement involving public school teachers * * *." *Sullivan,* 703 A.2d at 753.

In the case at bar, the parties no longer have a continuing stake in the outcome. As it stands today, the case is presented to us in the form of a hypothetical question that may or may not recur. We conclude, therefore, that this appeal became moot when the no-restructuring clause in the collective-bargaining agreement expired, on June 30, 2005. Accordingly, we believe it prudent not to reach the merits in this case.

## Conclusion

For the reasons stated herein, the appeal is denied and dismissed because it now has become moot.[4] The record shall be remanded to the Superior Court.

### Justice FLAHERTY, dissenting.

I respectfully dissent from the majority's holding in this case. Although I agree with the majority that the no-restructuring clause that is contained in the 2002 revision to the collective-bargaining agreement sunsetted by its owns terms on June 30, 2005, the remainder of the collective-bar-

---

4. Because the controversy has become moot, the decision of the Superior Court will not substantively be reviewed by this Court.

gaining agreement did not. Indeed, Article XXIII, section 1, of the original collective-bargaining agreement that the parties modified, the mayor signed, and the council ratified, provides that:

"The provisions of this Agreement shall remain in effect from July 1, 2001, through June 30, 2004, and shall *continue thereafter from year to year unless either party gives notice in writing one hundred twenty (120) days prior to the expiration date to the other party* of his/her desire to terminate this Agreement in which event this Agreement shall terminate on June 30, 2004* * *." (Emphasis added.)

When the parties replaced that agreement with the revised agreement, dated June 4, 2002, they concurred that:

"The document titled 'Agreement between City of Cranston, Rhode Island and Rhode Island Laborers' District Council on behalf of Local Union 1033 of the Laborers' International Union of North America, AFL–CIO, effective July 1, 2001 through June 30, 2004' is herein incorporated by reference as if fully reproduced. The terms and conditions of this Agreement shall continue and remain in effect for the period of July 1, 2002 through June 30, 2005, except as expressly modified herein."

In essence, the only modifications in June 2002 to the original collective-bargaining agreement were Local 1033's concessions on pay and clothing allowances, and the city's promise that it would not reduce the number of crossing guards until June 30, 2005. Thus, the termination provision of the original agreement continued in full force and effect unless and until one of the parties notified the other that it wished to terminate the agreement. There is nothing in the record to indicate that either the city or Local 1033 gave notice of its desire to bring the collective-bargaining agreement to an end. Indeed, at oral argument, both parties acknowledged that no such notice was given by either. Therefore, except as modified by the 2002 revision, the original collective-bargaining agreement continued in full force and effect in all respects.

To me, it is significant that a specific provision of the original agreement between the city and Local 1033 controls in the event of a layoff.[5] Also, there is no question that despite the fact that the city terminated the employment of the members of the union, Local 1033 continues to be the recognized bargaining agent for the crossing guards unit.[6]

For all of these reasons, I cannot concur with the majority's holding that there has ceased to be a live controversy here, or

---

**5.** Article VI, section 6, of the original collective-bargaining agreement, entitled "Termination and Recall," provides:

"In the event a reduction in Crossing Guards is required, persons with the least seniority will be laid off first. Recalls of employees shall be accomplished in reverse order of lay-off. Laid-off employees shall retain their seniority as of original date of hire provided recall occurs within two years from the date of lay-off. This provision shall be retroactive for all employees who have been laid off and recalled. Crossing Guards will not receive credit toward pension for time laid off."

**6.** Article I, section 1, of the original collective-bargaining agreement, entitled, "Union Recognition and Management Rights," reads as follows:

"The Employer recognizes that the Rhode Island Laborers' District Council on behalf of LOCAL UNION 1033 of the Laborers' International Union of North America, AFL–CIO, is the exclusive representative for all individuals employed as regular Crossing Guards in the bargaining unit as established by the Rhode Island State Labor Relations Board as the result of a petition submitted in Case Number EE–3116."

that Local 1033 and its members no longer have a stake in the outcome of this case. In my opinion, this case is not moot, and therefore I believe that the dispute should be decided on its merits.

In *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946), the United States Supreme Court rejected a claim of mootness directed against a union defendant by a recently terminated employee who was an honorably discharged military veteran and who had recovered a monetary judgment against his employer but not against the union. *Id.* at 281, 66 S.Ct. 1105. By the time the case reached the Supreme Court, it was argued that relief had not been granted against the union and that a statutory guarantee prohibiting the discharge of a veteran without cause for one year, at issue in the case, had expired. *Id.* at 281–82, 66 S.Ct. 1105. Thus, it was contended that the dispute between the employee and the union was moot. *Id.* at 282, 66 S.Ct. 1105. However, the Supreme Court rejected the employee's argument that the union did not have an appealable interest in the case. *Id.* at 282–84, 66 S.Ct. 1105. It reasoned that the collective-bargaining agreement that was operative and at issue at the time of trial was still in existence at the time of the appeal. *Id.* Because an interpretation of that agreement would affect the union in the future, and because the union still had an active right at stake about that interpretation, the Court held that the case was not moot. *Id.* The Court noted that the issue before it was the question of whether there was a conflict between a collective-bargaining agreement and a legislative enactment, and, if so, which one prevailed (a situation eerily similar to the one before us in this case). *Id.* In deciding that the case was not moot, the Supreme Court said:

"But here the rights of the union and its members under a contract with the cor-

poration were adjudicated in a proceeding in which the union was a party. The contract was still in existence at the time of the appeal. Hence the case was not moot. And the only way the union could protect itself against that binding interpretation of the agreement was by an appeal. For then the union found itself in the position where a right of its own * * * was adjudicated." *Id.* at 283, 66 S.Ct. 1105.

Similar to the union in *Fishgold,* Local 1033 seeks to protect itself from a contention that the city is free to disregard its contractual obligations when it deems it expedient on the basis of a contention that a charter provision irreconcilably collides with a labor agreement. Because that interpretation may affect the union in the future and the collective-bargaining agreement was never terminated, the parties continue to have a stake in the outcome and, therefore, this case is not moot.

### Confirmation is not Compliance

I also believe that under the unique facts of this case it is important to highlight the difference between confirmation of, and compliance with, an arbitration award. It is well settled in this state that judicial authority to review or to vacate an arbitration award is "extremely limited." *Purvis Systems, Inc. v. American Systems Corp.,* 788 A.2d 1112, 1114 (R.I.2002) (quoting *Romano v. Allstate Insurance Co.,* 458 A.2d 339, 341 (R.I.1983)). Indeed, " '[A]bsent a manifest disregard of a contractual provision or a completely irrational result,' the courts have no authority to vacate an arbitration award." *Rhode Island Council 94, AFSCME, AFL–CIO v. State,* 714 A.2d 584, 587 (R.I.1998) (quoting *Rhode Island Brotherhood of Correctional Officers v. State Department of Corrections,* 707 A.2d 1229, 1234 (R.I.1998)). "A court therefore may not reconsider the

merits of an award despite allegations that it rests upon errors of fact or on a misinterpretation of the contract." *Id.* at 588 (citing *United Paperworkers International Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)). However, a trial justice must vacate an award:

"(1) When the award was procured by fraud.

"(2) Where the arbitrator or arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award upon the subject matter submitted was not made.

"(3) If there was no valid submission or contract, and the objection has been raised under the conditions set forth in § 28–9–13." G.L. 1956 § 28–9–18(a).

There is a distinction between confirmation of an arbitration award and ordering compliance with the award. That distinction becomes clear in this context; when confirming an arbitration award and reviewing whether an arbitrator exceeded his or her power, a court is simply to determine whether the arbitrator's award " 'dr[ew] its essence' from the agreement, if it was * * * based upon a 'passably plausible' interpretation thereof, if it manifestly disregarded a contractual provision, or if it reached an irrational result." *Woonsocket Teachers' Guild, Local 951, AFT v. Woonsocket School Committee,* 770 A.2d 834, 837 (R.I.2001) (quoting *State of Rhode Island Department of Children, Youth and Families v. Rhode Island Council 94,* 713 A.2d 1250, 1253 (R.I. 1998)). In other words, only the rationality and legality of the award, not whether the award has been, or can be complied with, is at issue.[7] The majority contends that the instant matter is moot because the no-restructuring clause has sunsetted and therefore cannot be complied with because it no longer would have an impact on the parties; however, Local 1033's inability to enforce compliance with the arbitration award should not dictate whether it should be confirmed. In my judgment, and with all due respect to the majority, the fact that the no-restructuring clause sunsetted by its own terms should not affect this Court's determination of whether the motion justice erred when he vacated the arbitrator's award. If in the future, Local 1033 sought to compel adherence with the award, then the issue of mootness may well be dispositive. However, in this proceeding, Local 1033 seeks only confirmation of the arbitrator's award; therefore, compliance is not an issue before us.[8]

7. A union alleging the noncompliance with an arbitration award has multiple options to secure compliance. First, it can file a charge of unfair labor practices with the Rhode Island State Labor Board. *See* G.L. 1956 § 28–7–13(11) (providing that it is an unfair labor practice for an employer to "[f]ail to implement an arbitrator's award unless there is a stay of its implementation by a court of competent jurisdiction or upon the removal of the stay"). Second, depending on the language of a particular collective-bargaining agreement, it may file a grievance under the terms of the collective-bargaining agreement for a failure to comply with the arbitration award. Third, it can file a motion in the Superior Court to confirm the arbitration award, and if successful, then file a motion for contempt for the employer's failure to comply with the confirmed award. *See Cranston Teachers Association v. School Committee of Cranston,* 416 A.2d 1180, 1183 (R.I.1980) (noting that a contempt motion is "an appropriate means by which a party may seek another's compliance with a judgment conforming to a confirmed arbitration award").

8. This case is before this Court on Local 1033's appeal from a Superior Court judgment denying its motion in the nature of a petition to confirm and enforce the arbitration award and granting the city's motion to stay and vacate the award. The city filed its motion to vacate the arbitration award on June 3, 2004, over a year before the no-restructuring clause was to expire. There-

### Exceptions to the Mootness Doctrine

Moreover, even if I were to concur that the case before us is moot, I nonetheless would contend that this dispute fits within that narrow class of cases that should be decided notwithstanding mootness because they are "of extreme public importance, which are capable of repetition but which evade review." *Arnold v. Lebel,* 941 A.2d 813, 819 (R.I.2007) (quoting *Morris v. D'Amario,* 416 A.2d 137, 139 (R.I.1980)). In my opinion, this is a case of extreme public importance because it implicates "matters concerning a person's livelihood." [9] *Cicilline v. Almond,* 809 A.2d 1101, 1106 (R.I.2002) (quoting *Associated Builders & Contractors of Rhode Island, Inc.,* 754 A.2d 89, 91 (R.I.2000)). There can be no question that the employment and livelihood of the crossing guards who formerly were employed by the city under the terms of this collective-bargaining agreement are at stake here. Further, I believe this dispute is one that is capable of repetition yet evading review.

As a foundation for not applying the exception to the mootness doctrine in the instant matter, the majority relies primarily on two cases. In *Town of Scituate v. Scituate Teachers' Association,* 110 R.I. 679, 684, 296 A.2d 466, 469 (1972), this Court held that a controversy involving a town's failure to fund a teacher contract under a collective-bargaining agreement that had expired was moot. It is indisputable that the agreement in that controversy had lapsed by its own terms by the time the case came before this Court for argument. However, a second, and just as important, reason that the Court held that case moot was that a financial town meeting, conducted subsequent to the entry of the judgment appealed from, resulted in additional money being appropriated to the school committee. *Id.* at 683–84, 296 A.2d at 468–69. This enabled the school committee to meet its commitments both to the teachers and to the public school system. *Id.* In other words, the Court held that the "real problem" had been resolved because the teachers had been made whole; therefore, there was no need to apply the mootness exception. *Id.* at

fore, because the no-restructuring clause still controlled at that time, Local 1033 sought to have the award confirmed and enforced based on G.L. 1956 § 28–9–17, which provides:

"At any time within one year after the award is made as prescribed in § 28–9–16, any party to the controversy which was arbitrated may apply to the court having jurisdiction as provided in § 28–9–14 for an order confirming the award. Upon that application, the court must grant the order unless the award is vacated, modified, or corrected as prescribed in §§ 28–9–18 and 28–9–19, or unless the award is unenforceable under the provisions of § 28–9–13. Notice of the motion must be served upon the adverse party or his or her attorneys, as prescribed by law for service of notice of a motion upon an attorney in an action in the same court."

While the Superior Court has previously granted or denied motions to confirm and enforce an arbitration award, § 28–9–17 does not provide the court with the authority to "enforce" an arbitration award; the statute only requires the court to confirm an arbitration award unless the award is vacated, modified, corrected or is unenforceable. On appeal, Local 1033 initially requested that this Court vacate the Superior Court judgment and grant its motion to confirm and enforce the arbitrator's award; however, during oral argument, Local 1033's counsel conceded that in actuality the union is only requesting that the award be confirmed.

9. This Court has frequently said that "[c]ases demonstrating extreme public importance are usually matters that relate to important constitutional rights, matters concerning a person's livelihood, or matters concerning citizen voting rights." *Cicilline v. Almond,* 809 A.2d 1101, 1106 (R.I.2002) (quoting *Associated Builders & Contractors of Rhode Island, Inc.,* 754 A.2d 89, 91 (R.I.2000)).

684, 296 A.2d at 469. *Town of Scituate* differs starkly from the instant case because here, nothing between the city and Local 1033 has been resolved. If the parties reach a new agreement, but we do not reach the merits of the case, what would prevent the city from once again terminating employees in a claimed violation of its contractual obligations?

In *Sullivan v. Chafee*, 703 A.2d 748 (R.I. 1997), five Warwick City Council members requested a declaratory judgment to determine the mayor's authority to veto a budget passed by the council, in favor of an earlier budget submitted by the mayor, but not adopted by the council. *Id.* at 749. By the time the dispute finally reached this Court, the budget year in question, 1997, long had passed and we denied the appeal as moot. *Id.* at 753. The majority sees an analogy between *Sullivan* and the case now before us because the no-restructuring clause set forth in the revised collective-bargaining agreement, like the 1997 municipal budget in *Sullivan*, has sailed off into the sunset.

I would respectfully suggest, however, that the majority has overlooked other factors present in *Sullivan* that are not present in the instant matter and that render that case inapplicable to the considerations before us. Significantly, in *Sullivan*, this Court was struck by the fact that "because plaintiffs are no longer asking us to invalidate the city's FY 1997 budget, our decision would rest upon a speculative future factual scenario that in whole or in part may never come to pass."[10] *Sullivan*, 703 A.2d at 751. This Court then detailed a convoluted set of hypotheticals that also could have occurred with respect to the city's budgeting, making the case far too

abstract for this Court to tackle. *Id.* at 751–52. Here, however, there is but one discrete issue and, importantly, Local 1033 continues to ask for the same relief for which it has asked from the beginning: confirm the arbitrator's award that the actions of the city violated its collective-bargaining agreement. Moreover, in *Sullivan*, we noted that a reason that the mootness exception did not apply was because the case did not concern any person's livelihood, and, therefore, the "extreme public importance" part of the mootness exception did not apply, certainly not the case in this matter. *Id.* at 754.

The majority notes that this Court rarely applies the mootness exception when dealing with a case concerning "ordinary contract disputes * * * or to the binding effect of a collective bargaining agreement involving public school teachers." *Sullivan*, 703 A.2d at 753. This analysis, however, fails to recognize that the United States Supreme Court repeatedly has acknowledged that labor conflicts are the sort of disagreements that often remain "live" and are likely to be repeated in the future, necessitating reaching the merits of the underlying dispute. *See, e.g., Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO*, 428 U.S. 397, 403 & n. 8, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976) (Court noted that a strike might have been "resumed at any time in the near future at the direction of the [union]" and it found a live controversy despite the fact that the striking workers had returned to the job and the collective-bargaining agreement in effect when the dispute arose had expired when the parties stipulated that those agreements governed the resolution of the underlying dispute); *see also Jacksonville*

---

**10.** On appeal, the city council no longer sought to have the budget adopted by the council imposed retroactively, but limited its appeal to the validity of the Superior Court's legal analysis concerning how the city charter's budgetary provisions should be construed vis-à-vis the mayor and the council.

*Bulk Terminals, Inc. v. International Longshoremen's Association*, 457 U.S. 702, 704 n. 1, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982) (The Court adjudicated a dispute arising out of a work stoppage that had been voluntarily abandoned six months before the case reached the Court, but the Court held the case still presented a live controversy. It commented, "[a]lthough the work stoppage is no longer in effect, there remains a live controversy over whether the collective-bargaining agreement prohibits politically motivated work stoppages, and the Union may resume such a work stoppage at any time. As a result, this case is not moot."); 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3533.3 at 287 (2d 1984) ("labor disputes * * * provide clear illustration of the private disputes that are preserved from mootness by the prospect of future repetition").

In *CSX Transportation, Inc. v. Brotherhood of Maintenance of Way Employees*, 327 F.3d 1309 (11th Cir.2003), the United States Court of Appeals for the Eleventh Circuit held that it was not precluded from deciding a classification dispute under the Railway Labor Act, even though the matter had been resolved prior to the court's decision. *Id.* at 1319–20. The court decided to rule on the case in spite of arguments that it had become moot because "underlying labor disputes presumably remain 'live,' although they might be abandoned by the parties in the meantime." *Id.* at 1319. The court took note of the Supreme Court's treatment of labor disputes and ruled that "we will not refuse to adjudicate the case on mootness grounds because, not only does the issue remain relevant between the parties, but it is the exact type of issue that would recur on a regular basis and perpetually escape review." *Id.* at 1320.

To support its view that the mootness exception does not apply to the matter before us, the majority contends that "[a]lthough a similar *legal* question possibly may arise in the future concerning a conflict between a city charter and the provisions of a collective-bargaining agreement, we cannot conclude that this particular *factual* scenario is one that is capable of repetition but which evades review." Even though I believe that this same factual scenario is indeed capable of repetition yet evading review, I also would highlight that this Court has not always required that the same factual scenario be likely to recur or that the same plaintiff be involved in the recurrence before deciding a case despite its mootness. In my opinion, this Court has merged two, sometimes overlapping, yet distinct exceptions to the mootness doctrine: *i.e.* the "public interest" or "extreme public importance" exception and the "capable of repetition yet evading review" exception. *See, e.g., State v. Lead Industries Association, Inc.*, 951 A.2d 428, 470 (R.I.2008) ("pursuant to that exception, we will on occasion opine on moot questions that are 'of extreme public importance [and] are capable of repetition but * * * evade review.'") (quoting *Morris*, 416 A.2d at 139); *Pelland v. State*, 919 A.2d 373, 378 (R.I.2007) ("we will review moot cases only when the subject matter is of 'extreme public importance' and the circumstances that gave rise to the initial controversy are capable of repetition while evading review") (quoting *Sullivan*, 703 A.2d at 752).

Although we apparently adhere to a merger of the two exceptions, other jurisdictions recognize the exceptions as distinct from one another. *See, e.g., Sanford v. Murdoch*, 374 Ark. 12 (2008) (highlighting two exceptions to the mootness doctrine as "(1) issues that are capable of repetition, yet evading review and (2) is-

sues that raise considerations of substantial public interest which, if addressed, might prevent future litigation"); *Doe v. Doe*, 116 Hawai'i 323, 172 P.3d 1067, 1071 n. 4 (2007) (noting the public interest and capable of repetition yet evading review exceptions are " 'separate and distinct' "); *Koch v. Canyon County*, 145 Idaho 158, 177 P.3d 372, 377 (2008) (acknowledging exceptions to mootness doctrine " '(1) when there is the possibility of collateral legal consequences imposed on the person raising the issue; (2) when the challenged conduct is likely to evade judicial review and thus is capable of repetition; and (3) when an otherwise moot issue raises concerns of substantial public interest' "); *Smith v. Hannaford Brothers Co.*, 940 A.2d 1079, 1081 (Me.2008) (recognizing three exceptions to the mootness doctrine, including when " 'the appeal contains questions of great public concern that, in the interest of providing future guidance to the bar and the public we may address; or * * * the issues are capable of repetition but evade review because of their fleeting or determinate nature' "); *DeCoteau v. Nodak Mutual Insurance Co.*, 636 N.W.2d 432, 437 (N.D.2001) ("Issues characterized as moot may nonetheless be decided by this Court if the controversy is capable of repetition, yet evading review, *or* if the controversy is one of great public interest and involves the power and authority of public officials." (emphasis added)); *Sloan v. Friends of the Hunley, Inc.*, 369 S.C. 20, 630 S.E.2d 474, 478 (2006) (recognizing two exceptions where the court may address issues despite mootness).

The critical factor here that warrants the application of an exception to the mootness doctrine and militates in favor of this Court reaching the merits of this case is the important difference between the "public-interest" exception and the "capable of repetition, yet evading review" exception. Under the former, the likelihood of recurrence upon which that exception depends need not involve the same plaintiff, or the "same factual scenario." *See In re Estate of Brooks*, 32 Ill.2d 361, 205 N.E.2d 435, 437–38 (1965).[11] Under the latter, however, the exception is typically limited to situations where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining par-

---

**11.** In *In re Estate of Brooks*, 32 Ill.2d 361, 205 N.E.2d 435 (1965), the lower court appointed a conservator that consented to a blood transfusion for a patient suffering from a peptic ulcer. *Id.* at 436. The patient, a Jehovah's Witness, believed that blood transfusions were a "violation of the law of God" and released the attending doctor and the hospital from any civil liability from the failure to administer a blood transfusion. *Id.* at 436–37. Despite assurances that her wishes would be complied with, a transfusion was successfully accomplished and the conservator subsequently was discharged. *Id.* at 437. The Illinois Supreme Court held that it should not dismiss the case as moot and instead decided the issues of religious freedom that the patient raised. *Id.* at 437–38. The court relied on the public-interest exception to resolve the claim that the case should be dismissed as moot. *Id.* In applying the exception the court said: "Among the criteria considered in determining the existence of the requisite degree of public interest are the public or private nature of the question presented, the desirability of an authoritative determination for the future guidance of public officers, and the likelihood of future recurrence of the question." *Id.* at 438. Notably absent from the court's articulation of the exception was the requirement that the same plaintiff present the future recurrence of the question before the court. *See id.* at 437–38; *see also Taylor v. Gill Street Investments*, 743 P.2d 345, 347 (Alaska 1987) (tenant's appeal of eviction judgment in favor of landlord was moot because tenant had already vacated the premises, but the court held that the issue of whether a landlord must strictly comply with a statutory time-notice provision fell within the public-interest exception to the mootness doctrine).

ty would be subjected to the same action again." *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (per curiam) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (per curiam)); *see also In re S.N.*, 181 Vt. 641, 928 A.2d 510, 512 (2007) (applying the two elements for the "capable of repetition, yet likely to evade review" exception and ruling that the exception did not apply because there was no indication that a New York resident would return to Vermont such that the resident and the state would be involved in similar litigation in the future).

The distinction between the two mootness exceptions is demonstrated in a number of cases in this jurisdiction in which this Court articulated the apparent "merged exception" to the mootness doctrine, but then, because the issues were matters of "extreme public importance," declined to require a showing that the repetition would involve the same plaintiff, or the same factual scenario.

In *In re Paula G*, 672 A.2d 872 (R.I. 1996), the Department of Children, Youth and Families sought the review of a Family Court decree, ordering a child in the department's care to be placed in a foster home in the State of Florida, without having first obtained the consent of the ap-

propriate public authorities for the placement of children in Florida pursuant to G.L. 1956 § 40–15–1.[12] However, by the time the dispute reached this Court, the case was moot because a Family Court justice had vacated the portion of the judgment that ordered the child's placement in the foster home. *In re Paula G*, 672 A.2d at 874. This Court addressed the mootness exception but, importantly, we did not hold that this particular factual scenario was one that was capable of repetition, yet likely to evade review; instead we said: "The *issue* before us is certainly capable of repetition, and we find it a matter of extreme public importance to clarify the obligation of the Family Court in similar situations in the future." *Id.* (Emphasis added.) The Court concluded: "Although the facts of this specific case are moot, we shall remind the Family Court of its responsibility to observe and to fulfill the purpose and the policy of the [Interstate Compact on the Placement of Children] by ensuring that its procedural provisions are effectively adhered to in the future." *Id.* at 875.

Similarly, in *State v. Cosores*, 891 A.2d 893, 893 (R.I.2006) (mem.), a defendant appealed from a Superior Court adjudication of probation violation that resulted in a one-year term of imprisonment. The defendant previously had pled nolo conten-

---

12. The Interstate Compact on the Placement of Children, G.L. 1956 § 40–15–1, Article III provides that if a child in state care is to be transferred to another state, then appropriate notice must be given to the recipient state:

"(a) No sending agency shall send, bring, or cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of children therein.

"(b) Prior to sending, bringing or causing any child to be sent or brought into a re-

ceiving state for placement in foster care or as a preliminary to a possible adoption, the sending agency shall furnish the appropriate public authorities in the receiving state written notice of the intention to send, bring, or place the child in the receiving state.

" ∗ ∗ ∗

"(d) The child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child."

dere to a second offense of possession of marijuana and had been sentenced to a one-year suspended sentence, with two years of probation. *Id.* When he failed to report to his probation officer, a warrant was issued for his arrest; however, he was not apprehended for over a year. *Id.* After the defendant failed multiple drug tests, a hearing justice sentenced the defendant to one year imprisonment. *Id.* The defendant contended that his probationary term had expired before the hearing justice found a probation violation and that therefore the hearing justice lacked the authority to impose a prison sentence on him. *Id.* at 894. The defendant appealed, but by the time the case reached this Court the defendant already had served his jail sentence. *Id.* This Court said that "[a]lthough the completion of a prisoner's sentence renders his or her appeal from the revocation of a term of supervised release moot, * * * we deem the *issue* of whether a defendant can be found in violation after his probation has expired and ordered incarcerated to be of extreme public importance and capable of repetition, yet evading review. Thus, we decline the state's invitation to declare defendant's appeal moot."[13] *Id.* (Emphasis added.)

Similar to *Paula G*, the Court in *Cosores* did not rule that this particular factual scenario—that this specific defendant would plead nolo contendere to possession of marijuana and then violate his probation that would result in the imposition of a sentence of a year in prison, but the sentence would be imposed after the probation period expired—was capable of repetition, yet likely to evade review. *See Cosores*, 891 A.2d at 894. Nor did the Court hold that reaching the merits of Cosores's appeal would likely require the Court to base its decision "upon a specula-

tive future factual scenario that in whole or in part may never come to pass," as we said in *Sullivan*. *Sullivan*, 703 A.2d at 751; *See Cosores*, 891 A.2d at 894. Instead, the Court in both *Paula G* and *Cosores* chose to apply the exception to the mootness doctrine and reach the merits because each case involved issues of extreme public importance. *See Cosores*, 891 A.2d at 894; *In re Paula G*, 672 A.2d at 874.

We are not alone in our apparent merger of these two exceptions to the mootness doctrine; our sister state of Connecticut has a similar formulation of its mootness exception. In *Dutkiewicz v. Dutkiewicz*, 289 Conn. 362, 957 A.2d 821 (2008), the Connecticut Supreme Court said:

"The mootness doctrine does not preclude a court from addressing an issue that is 'capable of repetition, yet evading review.' * * * '[F]or an otherwise moot question to qualify for review under the capable of repetition, yet evading review exception, it must meet three requirements. First, the challenged action, or the effect of the challenged action, by its very nature must be of a limited duration so that there is a strong likelihood that the substantial majority of cases raising a question about its validity will become moot before appellate litigation can be concluded. Second, there must be a reasonable likelihood that the question presented in the pending case will arise again in the future, and that it will affect either the same complaining party or a reasonably identifiable group for whom that party can be said to act as surrogate. Third, the question must have some public importance. Unless all three requirements are met, the appeal must be dismissed as moot.'" *Id.* at 826–27 (quoting *Loisel v. Rowe*, 233

---

**13.** While the Court said it was not dismissing the case as moot, it is clear that this Court decided the issues before it notwithstanding mootness.

Conn. 370, 660 A.2d 323, 328, 330 (1995)).

The important aspect of the Connecticut articulation of the mootness exception with respect to this case is its second part. By requiring that the legal issue before the court will "affect either the same complaining party or a reasonably identifiable group for whom that party can be said to act as surrogate," the court has required a "nexus between the litigating party and those people who may be affected by the court's ruling in the future." *Id.* at 828 (quoting *Loisel*, 660 A.2d at 330, 331). This rationale allows the court to reach the merits of cases in which the specific legal question probably will recur without a " 'strict rule that the *identical* party must be likely to be affected in the future.' " *Id.* (quoting *Loisel*, 660 A.2d at 331). Although this Court has never explicitly held as such, *Paula G* and *Cosores* demonstrate that we employ similar reasoning in cases that are of extreme public importance.

In conclusion, it is my opinion that there is not always a requirement that the same factual scenario be likely to recur and that since we are confronted with a matter of extreme public importance, *i.e.* the livelihood of the crossing guards and the sanctity of governmental contractual obligations, this case should be decided on the merits because similar issues may arise in the future. By failing to address the merits of this case, I respectfully suggest that we are approaching the slippery slope of establishing troubling precedent. Because this Court declines to decide the dispute between the parties, what would prevent the city, or any other municipality in this state, from terminating any contract, be it labor or otherwise, and then arguing that the matter has become moot as the controversy made its long route to this Court? In my opinion, and with great respect for the majority's opinion, this case should be decided on its merits.

**The Merits**

On the merits, the arbitrator's award should be confirmed and the judgment of the Superior Court should be vacated. As the arbitrator correctly concluded, there is simply no justification for the city to repudiate an agreement for which it bargained and for which it received concessions and which was executed by the mayor and ratified by the council. The city attempts to avoid its contractual obligations by contending that the matter was nonarbitrable in the first place because of what it argues is a direct conflict between the language of the collective-bargaining agreement and the charter. I do not agree. Chapter 5, section 5.05 of the charter, entitled "Flexibility in administrative organization," provides:

"It shall be the duty of the mayor to carry on continuing studies of the operation of the city government as organized under this Charter and to recommend to the council for its action under section 3.16 measures assigning and reassigning functions and activities not specifically assigned by this Charter as between departments, divisions or other administrative units; creating, abolishing or recreating divisions and other units below the departmental level; and creating, abolishing or recreating departments for the administration of functions and activities not definitely assigned to departments by this Charter."

Further, chapter 3, section 3.16 of the charter, entitled "Powers over organization of the city government," provides:

"The council shall have power by ordinance not inconsistent with other provisions of this Charter to create, modify or abolish departments and nondepartmental agencies in addition to those provid-

ed for in this Charter; and to create, modify or abolish within departments[,] divisions, bureaus and other organizational units not established by this Charter. The council shall further have power by ordinance not inconsistent with this Charter and subject in particular to the provisions of chapter 14, to fix the number, qualifications, powers, duties, hours of work and compensation of all officers and employees of the city except employees of the school committee and to make needful rules and regulations for the operation of all public buildings except school buildings, public grounds, parks, parkways, streets and other public property."

In my opinion, the city hangs its hat on language in the charter that lies somewhere between the amorphous and the aspirational, but in no way can it be said that the language conflicts with the municipality's specific obligations under both the collective-bargaining agreement and Rhode Island's Municipal Employees' Arbitration Statute, G.L. 1956 chapter 9.4 of title 28. Indeed, even if the city's interpretation of the charter language were correct, it is without question that it did not take action for the purposes of "creating, abolishing, or recreating" municipal agencies, as the charter suggests. It simply discharged one group of employees with which it had a contractual obligation in favor of another group that was willing to do the very same work for less money.

This contract may have been too rich for the city's blood, but it is beyond dispute that the city agreed to it, the city requested that it be amended, the city's chief executive officer signed it, and the city's legislative body ratified it. Municipalities cannot simply shed contractual obligations because a better deal can be found elsewhere, terminating a legally binding agreement in the process. *See Exeter–West Greenwich Regional School District v. Exeter–West Greenwich Teachers' Association,* 489 A.2d 1010, 1020 (R.I.1985) (holding that "a city or town is bound by and must fund the valid collective-bargaining agreements entered into by its school committee as well as other obligations incurred in the providing of services mandated by law").

Finally, the arbitrator's award is entitled to deference because it draws its essence from a passably plausible interpretation of the agreement. In fact, the city does not even contend that the award is irrational or that the arbitrator exceeded his authority. It argues only that the matter was not arbitrable because it entered into an agreement from which it should have refrained. As we have said on innumerable occasions, beginning with *Jacinto v. Egan,* 120 R.I. 907, 391 A.2d 1173 (1978), when discussing a court's role in reviewing an arbitration award:

"The proper role for the courts in this regard is to determine whether the arbitrator has resolved the grievance by considering the proper sources * * * but not to determine whether the arbitrator has resolved the grievance correctly. * * * As long as the award 'draws its essence' from the contract and is based upon a 'passably plausible' interpretation of the contract, it is within the arbitrator's authority and our review must end." *Id.* at 912, 391 A.2d at 1176 (quoting *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)); *Safeway Stores v. American Bakery & Confectionery Workers International Union, Local 111,* 390 F.2d 79, 83 (5th Cir.1968).

**Conclusion**

I see no merit in the city's argument and therefore would vacate the judgment of

the Superior Court and confirm the arbitrator's award.