**Representative David N. CICILLINE et al.**

**v.**

**Lincoln C. ALMOND, in his capacity as Governor of the State of Rhode Island.**

**Aram G. Garabedian, in his official capacity as a State Senator and Chairman of the Senate Subcommittee on Human Services and Transportation et al.**

**v.**

**The Governor of the State of Rhode Island, Lincoln C. Almond in his official capacity et al.**

**No. 2001–631–M.P.**

Supreme Court of Rhode Island.

Nov. 13, 2002.

William J. Harsch, David N. Cicilline, Bristol, for Plaintiff.

Claire J. Richards, Rebecca Tedford Partington, Cumberland, Douglas J. Emanuel, for Defendant.

Present: WILLIAMS, C.J., and LEDERBERG, FLANDERS, and GOLDBERG, JJ.

## OPINION

PER CURIAM.

In December 2001, certain individual state legislators and Advent House, Inc. (Advent House), a beneficiary of a government-funded housing program, filed two Superior Court lawsuits challenging the propriety of Governor Lincoln C. Almond's (Governor) alleged decision to freeze certain spending on a legislative initiative known as the Neighborhood Opportunities Program for Affordable Housing (housing-funds program or NOP).[1] Soon thereafter, the Governor filed a petition with this Court seeking the issuance of a writ of certiorari to review a Superior Court order that set the cases down for a hearing; ruled that legislators David N. Cicilline and Catherine Graziano (Cicilline/Graziano) possessed standing to question the legality of the Governor's action in their complaint; and also decided that their claims were not moot, that the Attorney General could intervene as a defendant, and that the Cicilline/Graziano plaintiffs had provided the Governor with adequate notice for the scheduled hearing to proceed. The Governor also filed a motion for an emergency stay of all proceedings in the Superior Court.[2] Eventually, we

---

1. In the first lawsuit (PC 01–6626) (the Cicilline/Graziano action), plaintiffs sought a writ of mandamus to enjoin the Governor from suspending the disbursement of money that the General Assembly had appropriated for NOP in 2001 when it passed the Rhode Island State Budget for fiscal year 2002.

 In the second lawsuit (PC 01–6750) (the Garabedian action), plaintiffs sought declaratory relief under the Uniform Declaratory Judgments Act, the Administrative Procedures Act, and 42 U.S.C. § 1983. They also sought a declaration that the Governor and the Department of Administration (DOA) were unlawfully prohibiting the Housing Resources Commission (HRC) from spending money appropriated for NOP. In count 1 they alleged that the Governor and DOA exceeded their authority to control state spending under G.L. 1956 § 35–3–24 by prohibiting HRC from spending $5 million appropriated in the fiscal year 2002 budget. Count 2 asserted that the Governor and DOA violated section 10 of the Rhode Island Housing Resources Act of 1998 (P.L.1998, ch. 31, art. 29) by prohibiting HRC from spending this $5 million. G.L.1956 § 42–128–10. Count 3 asserted that the Governor and DOA violated the Presentment Clause of article 9, section 14, of the Rhode Island Constitution by effecting a line item veto of NOP's appropriation. Count 4 alleged that DOA violated the Administrative Procedures Act by denying a grant awarded to NOP without notice and opportunity to be heard. Count 5 alleged that DOA violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution by denying a grant awarded to NOP.

2. The Governor directed his petition for the issuance of a writ of certiorari and motion for a stay toward not only the Cicilline/Graziano action but also to the Garabedian action filed by state legislators Aram G. Garabedian, Thomas J. Izzo, Antonio J. Pires, Thomas C. Slater, and Aisha W. Abdullah–Odiase, and by Advent House, Inc., a beneficiary of the housing-funds program. These plaintiffs filed their complaint after the Cicilline/Graziano action began, but they also challenged the Governor's alleged conduct in freezing disbursal of the appropriation for the housing-funds program. The Garabedian plaintiffs also sought and obtained a joint hearing date with the Cicilline/Graziano action in the Superior Court. We treated these cases as con-

granted the requested stay, as well as the petition for writ of certiorari, placed the petition for certiorari on the show-cause calendar, and continued the stay until further order of this Court. We also instructed the parties to file supplemental memoranda on the issue of service of process in the Cicilline/Graziano action and on the issues of standing and mootness in regard to plaintiffs in both cases. On June 11, 2002, we denied the Governor's motion to dismiss the cases as moot, as well as the motion of plaintiffs in the *Garabedian* action to quash the writ of certiorari, but we did so without prejudice to the parties raising and arguing these same issues at oral argument.

### Legislation Relating to the Housing–Funds Program

On July 5, 2001, the General Assembly enacted House Bill No. 6100A "Making Appropriations for the Support of the State for the Fiscal Year Ending June 30, 2002." P.L.2001, ch. 77. In doing so, the General Assembly appropriated a total of $8,652,098 to the Housing Resources Commission (HRC).[3] Neither party disputes that the Legislature allotted approximately $5 million of that appropriation for disbursement to the housing-funds program. Thereafter, on November 6, 2001, the director of the Department of Administration (DOA) sent a letter to the chairperson of HRC, saying that: "In order to preserve the State's options for resolving the [fiscal] problem in the current year, we will not authorize any expenditures from the $5,000,000 allotment for [the] Neighborhood Opportunities Program." The plaintiffs then filed their lawsuits and the Superior Court acted thereon in the manner previously described—after which we granted the petition for a writ of certiorari and stayed further proceedings in the Superior Court.

On March 27, 2002, however, the General Assembly passed and the Governor signed into law 2002–H–6626A, "An Act Approving The Financing of Housing Programs (Act)."[4] P.L.2002, ch. 423. This act withdrew the $5 million that the General Assembly had appropriated for the housing-funds program in 2001, and replaced that appropriation with $10 million in bond financing to be raised through the Rhode Island Housing and Mortgage Finance Corporation.[5]

### Stipulation of Mootness

On September 26, 2002—the date of the oral argument on this petition—the Cicilline/Graziano plaintiffs filed a stipulation

---

solidated for purposes of granting the petition for writ of certiorari.

**3.** Act 2001–H 6100A lists, in the line item pertaining to the "Housing Resources Commission," a total of $8,652,098.

**4.** In this Act, the General Assembly stated that: "This financing proposal is a prudent funding mechanism that provides replacement funding for these housing programs and an additional $5,000,000 for the Neighborhood Opportunities Program in Fiscal Year 2003; * * * [resulting in] $10,000,000 of funding for the Neighborhood Opportunities Program providing $5,000,000 in both Fiscal Year 2002 and Fiscal Year 2003 * * *." P.L. 2002, ch. 423.

**5.** Public Laws 2002, ch. 65, art. 10, § 1 (2002–H 7732A enacted on June 12, 2002) incorporated the Fiscal Year 2002 Supplemental Appropriations Act. In the first column, titled "FY 2002 Enacted," the Legislature showed a total appropriation to HRC of $8,652,098; in the middle column, "FY 2002 Variance," the amount removed from that appropriation was shown as $5,001,237; and in the last column, "FY 2002 Recommend," the remaining appropriation shown was $3,650,861. Thus, the General Assembly removed about $5 million from HRC's appropriation.

with this Court in which they agreed "that the issues raised in this matter before the Superior Court are moot, and, therefore no longer justiciable." Consequently, they agreed to withdraw their complaint. The plaintiffs in the Garabedian action, however, did not agree that their case was moot and, in any event, they asked us to rule on the petition because they asserted that the issues raised were of extreme public importance, capable of repetition, yet likely to evade judicial review.

## Analysis

After considering the parties' written and oral submissions, and assuming, without deciding, that the legislator plaintiffs possessed the requisite standing to raise these issues, that the issues were otherwise justiciable, and that the joinder rule of G.L.1956 § 9–30–11 [6] would not bar us from considering them, we are persuaded that, as a practical matter, these cases are now moot. "This Court has consistently held that a case is moot if the original complaint raised a justiciable controversy, but events occurring after the filing have deprived the litigant of a continuing stake in the controversy." *Associated Builders & Contractors of Rhode Island, Inc. v. City of Providence*, 754 A.2d 89, 90 (R.I. 2000). The plaintiffs in both cases sought the disbursal of the previously appropriated $5 million to the above-referenced housing-funds program. Under legislation enacted in March 2002 (P.L.2002, ch. 423), the General Assembly restored funding to this program through bond financing to be raised through the Rhode Island Housing and Mortgage Finance Corporation. Moreover, in doing so, the Legislature specifically withdrew the previous $5 million appropriation that was the subject of this lawsuit. Even if the Governor's supplemental appropriation bill, which specifically referenced the withdrawal, had not been enacted into law, it still appears, nevertheless, that the General Assembly has replaced the original appropriation with an alternate financing mechanism through legislation that passed in 2002. Thus, after the filing of these lawsuits, the Legislature not only withdrew the appropriation that was the subject of the lawsuits,[7] but also provided for substitute financing.[8] In the final analysis, therefore, the Governor's challenged action in this case appears to have affected only the timing for the disbursal of the appropriation for the housing-funds program.

 This Court will not adjudicate a moot case unless the issues raised are "of extreme public importance, which are capable of repetition but which evade re-

---

**6.** General Laws 1956 § 9–30–11 provides that "[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding."

This Court has stated:

"[W]e have * * * excuse[d] nonjoinder and allow[ed] representation by class members only in circumstances where it is impractical to require the joinder of all members of the class. That impracticability may exist when the members of the class whose rights are to be affected are so numerous or service upon them would entail such difficulties as would impose an unreasonable bur-

den on the moving party." *In re City of Warwick*, 97 R.I. 294, 297, 197 A.2d 287, 289 (1964).

**7.** That act states: "That there shall be withdrawn in the Fiscal Year 2002 Supplemental Appropriations Act appropriations in the amount of $5.0 million for the Neighborhood Opportunities Program * * *." P.L.2002, ch. 423.

**8.** *See* 2002–H 7732A am, enacted on June 12, 2002, showing "FY 2002 Variance" of $5,001,237 for HRC. This public law incorporated the Fiscal Year 2002 Supplemental Appropriations Act. P.L.2002, ch. 65.

view." *Sullivan v. Chafee,* 703 A.2d 748, 752 (R.I.1997) (quoting *Morris v. D'Amario,* 416 A.2d 137, 139 (R.I.1980)). "The reason this is so is that whenever a court acts without the presence of a justiciable case or controversy, its judicial power to do so is at its weakest ebb." *Sullivan,* 703 A.2d at 752. "[C]ases demonstrating extreme public importance are usually matters that relate to important constitutional rights, matters concerning a person's livelihood, or matters concerning citizen voting rights." *Associated Builders,* 754 A.2d at 91. To the extent that the issues in this case were once of extreme public importance, the Legislature has addressed them by withdrawing the original appropriation and by providing for alternate financing in an even greater amount than the previous appropriation. Thus, there appears to be no reason for this Court to address the merits of the legal questions presented. The dispute over the Governor's power to freeze the $5 million appropriated in 2001 is moot because the General Assembly withdrew that appropriation and HRC and NOP will now receive the funding in question from another source. In addition, because the last budget cycle has ended, it is speculative at best whether the Governor's alleged failure to disburse the appropriation for such a housing-funds program when plaintiffs asserted he should have done so is apt to recur in the future. Much less can we fathom any reason why such potential future action would be likely to evade judicial review.

■ Furthermore, it appears to us that Advent House is not entitled to pursue a lawsuit challenging the Governor's authority to delay disbursement of the appropriated funds. *See Retired Adjunct Professors of Rhode Island v. Almond,* 690 A.2d 1342, 1346 (R.I.1997) (statutory beneficiaries' reliance on unilateral legislative enactments does not create individual contract or property rights absent bargained for exchange). As a mere beneficiary of a government-funded housing program, Advent House lacked standing to challenge these actions. In any event, the agreement between HRC and Advent House stated, in the Special Conditions section, in Part III "Contractual Agreement: Scope of Work and Special Conditions," that: "[t]he Contractor [Advent House], shall not obligate nor expend funds until the Commission has issued a release of funds. Funding is conditioned on approval of the balance of funds necessary to complete the development." Thus, funding for NOP and Advent House was contingent on HRC's releasing the money and on obtaining approval for the balance of money necessary to complete the housing-funds project.

■ Finally, we address one further argument that the Garabedian plaintiffs raise, challenging our jurisdiction to rule on their case. They point out that, pursuant to G.L.1956 § 8–2–13, "the superior court shall, except as otherwise provided by law, have exclusive original jurisdiction of suits and proceedings of an equitable character." Nevertheless, this Court retains the power of "general supervision of all courts of inferior jurisdiction to correct and prevent errors and abuses therein when no other remedy is expressly provided." G.L.1956 § 8–1–2. We can also issue writs of certiorari "and all other extraordinary and prerogative writs and processes necessary for the furtherance of justice and the due administration of the law." *Id.* In addition, we have "jurisdiction to adapt, to modify, or to frame new writs to meet the needs of the judicial system." *Estate of Sherman v. Almeida,* 610 A.2d 104, 106 (R.I.1992). Thus, even though, when we issued the writ of certiorari, the trial court had not yet ruled in the Garabedian action except for scheduling a hearing

thereon with the Cicilline/Graziano case to address unspecified matters relating to both complaints, this Court, in the exercise of the above-referenced powers, possessed jurisdiction over these actions that the Governor properly invoked when he petitioned the Court to issue a writ of certiorari to review the Superior Court's orders in these cases.

### Conclusion

Based on this statute, the above-described posture of these cases, and the Court's inherent constitutional power to superintend trial court proceedings, we grant the petition for certiorari, quash the Superior Court's previously entered orders, and remand both cases to the Superior Court with directions to enter final judgments dismissing the Garabedian and Cicilline/Graziano actions as moot.