June 20, 2019

Kevin M. Blais          :

v.          :

Rhode Island Airport Corporation et al.     :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Kevin M. Blais          :

v.          :

Rhode Island Airport Corporation et al.          :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.**  The Rhode Island Airport Corporation (RIAC) and its director, Kelly Fredericks, seek review of a Superior Court judgment that reversed RIAC's 2015 order prohibiting the plaintiff, Kevin Blais, from entering the North Central State Airport.  This matter reaches us by way of writ of certiorari in accordance with the Uniform Aeronautical Regulatory Act (UARA), G.L. 1956 chapter 4 of title 1, and the Administrative Procedures Act, G.L. 1956 chapter 35 of title 42.  In this case of first impression, we are tasked with deciding whether or not RIAC is cloaked with the inherent authority to preclude an individual from entering an airport within its jurisdiction without having first issued a formal order and, if a formal order was required, whether the communications issued by RIAC purporting to bar the plaintiff from North Central State Airport complied with the procedural requirements of the UARA.  For the reasons stated herein, we affirm the well reasoned decision and judgment of the Superior Court.

# I

# Facts and Travel

RIAC was created as, in the words of the statute, a "subsidiary public corporation" of the Rhode Island Commerce Corporation, in accordance with G.L. 1956 § 42-64-7.1(b) and (h).[1] *See In re Advisory Opinion to Governor*, 627 A.2d 1246, 1248 (R.I. 1993). The director of RIAC is responsible for the management and safe operation of several airports in Rhode Island, including the North Central State Airport in Smithfield (North Central). *See* § 1-4-9.

In 2010, Kevin Blais purchased a "gate key," which provided him with operational access to the airfield at North Central and allowed him to store his airplane at that facility. For the next several years, Blais regularly flew his airplane from North Central although, according to RIAC, those years were not without incident. Reports of Blais's troubling conduct plagued his tenure at North Central and, according to RIAC, prompted RIAC to direct its attorneys to send Blais a "no-trespass" letter that advised him that he was no longer welcome at North Central. That letter, dated February 14, 2014, read, in its entirety:

> "This firm represents the Rhode Island Airport Corporation (the 'RIAC').
>
> "Please be advised that you are not allowed to enter the premises of North Central State Airport. If you ignore this directive, you will be deemed a trespasser pursuant to Rhode Island General Laws Section 11-44-26 and RIAC will take appropriate legal action."

The no-trespass letter was signed by an attorney from a law firm that represented RIAC, and it did not include any additional information or attachments.

---

[1] When RIAC was created, the Rhode Island Commerce Corporation was known as the Rhode Island Port Authority and Economic Development Corporation. *See* G.L. 1956 § 42-64-1.1.

Several days after he received the no-trespass letter, Blais attended a safety seminar that was being conducted at North Central, but his presence was soon discovered by airport personnel and airport police escorted him from the airport. In connection with that incident, Blais was subsequently prosecuted for criminal trespass pursuant to G.L. 1956 § 11-44-26. Blais was convicted in the District Court and appealed to the Superior Court for a trial *de novo*. However, before the matter could be tried, the Attorney General dismissed the case.[2]

In May 2015, RIAC issued a Notice of Hearing concerning the February 2014 no-trespass letter. The Notice of Hearing informed Blais that a hearing would be held in June 2015 at North Central and that a hearing officer had been retained to investigate the "facts concerning the potential lifting of the No Trespass issued to Kevin Blais in connection with the North Central Airport." The hearing officer would be empowered to hear testimony and take evidence from any witnesses who wished to be heard, and he would ultimately author a report and recommendation "regarding whether the No Trespass should be lifted and, if so, under what, if any, restrictions." The Notice of Hearing made it clear that the hearing would "not proceed in the manner of a formal adversarial adjudication"; that the hearing officer's report would "not constitute a final determination of the matter"; and that "[t]he Executive Director [of RIAC] shall make such final determination following a review of the report and recommendation."

Even though Blais did not attend the hearing personally, he was represented by counsel who appeared on his behalf. In total, ten witnesses testified and were cross-examined at the hearing. Most of those witnesses testified about incidents involving Blais that had made them feel, at best, uncomfortable and, at worst, unsafe.

---

[2] We note that the criminal proceedings are of no particular relevance to the case currently before this Court, and we relay the incident solely for the sake of narrative cohesion.

Frank Sherman, an eighty four year old flight instructor, testified that late one afternoon he was landing at North Central with one of his students.[3] Sherman said that Blais announced his intention over the radio to make a landing from the direction through which Sherman had just been flying. According to Sherman, "[t]he visibility in the area was terrible" that day and, believing Blais would have difficulty seeing the other planes in the area, Sherman "suggested to him that that wasn't a good way to come into the traffic pattern." Later, after both aircraft had landed, Blais approached Sherman and his student as they were securing their airplane. According to Sherman, "[Blais] landed and came over to me in the most belligerent, violent way that you can imagine. I was somewhat frightened. The woman that I was flying with was frightened." Sherman testified that Blais told him he was "an unfit person" and that Sherman was "trying to teach people to fly on the radio" by "using the common traffic advisory frequency in a way that should not be used[.]"

David LaChapelle claimed to have been present for the confrontation between Sherman and Blais, and, according to LaChapelle: "It wasn't a discussion. It was just yelling, screaming." LaChapelle, tempering the actual four letter word that had been used, told the hearing officer that he had heard Blais call Sherman "a fricking idiot."

Lance Eskelund testified that he also witnessed the confrontation. According to Eskelund, Blais was acting "threatening, belligerent" and "[h]e actually lunged at Frank." Eskelund testified that he believed at the time "that Frank was probably going to get punched[,]" but that Blais instead walked away when he saw Eskelund approaching.

Paul Harry Smith, the airport manager at North Central, testified about a different incident. According to Smith, in January 2013, Blais entered Smith's office at North Central,

---

[3] It was later clarified that this incident occurred in August 2013.

demanding to know who had deactivated his gate key. Although Smith explained that the gate key had been turned off because Blais no longer kept a plane at the airport, Smith said that the situation kept escalating. According to Smith, Blais punctuated his disturbance by telling Smith that "bad karma is coming [Smith's] way" and that Smith "could not be that much of a fucking dick." Smith said that, because he believed Blais's foul-mouthed opprobrium to be a threat, he called the RIAC police, at which point Blais "turned around and left." John Sulyma, a pilot who flew out of North Central, said that he was in Smith's office immediately after Smith's confrontation with Blais, and that Smith had told him "[h]e felt threatened by Mr. Blais. He felt his family was threatened."[4]

Several more witnesses testified about other minor incidents that involved Blais. Paul Carroll, a pilot of forty years who had previously promoted safety initiatives for the Federal Aviation Administration (FAA), said that he was concerned about what he termed as Blais's "cavalier attitude." Carroll recounted a conversation that he had had with Blais in which Blais had bragged about flying into the clouds. That behavior, Carroll testified, was "an extremely dangerous position for a private pilot, let alone a student pilot" such as Blais. He also related an incident in which Blais had crossed an active runway while Carroll was attempting to land his airplane, and he claimed that Blais had "accosted" him on more than one occasion. According to Carroll, Blais had told him "directly that he has a permit to carry a gun, and he wears a bulletproof vest[,]"—a comment that Carroll took to be a threat.

Kevin DiLorenzo, Blais's flight instructor, testified that he had never seen Blais acting belligerently or disrespectfully. Nevertheless, he recounted an episode in which Blais, then

---

[4] Sulyma also testified that he was the sponsor of the safety seminar from which police had escorted Blais in early 2014. According to Sulyma, Blais had cooperated with police, but seemed "dumbfounded" at having been forced to leave.

DiLorenzo's student, called to let DiLorenzo know that he intended to make a flight without DiLorenzo's signature in his logbook. According to DiLorenzo, the flight would not be legal without his signature, so he told Blais not to fly until DiLorenzo could drive to the airport. DiLorenzo told the hearing officer that he believed Blais would have made the flight with or without his signature in the logbook because Blais's plane was already on the ramp when DiLorenzo intercepted him, and Blais was walking to his plane with a loaded flight bag. Since that incident, DiLorenzo had refused to fly with Blais and had in fact stayed away from the airport for about four to five months—long enough for his obligation to remain as Blais's flight instructor to expire.

John Guerin and Raymond Venticinque also testified that their own interactions with Blais had been less than pleasant. Guerin reported that he had once delivered a letter to Blais while he was in his aircraft and that Blais "started wigging out," threw the letter out from the cockpit window, and then later complained to RIAC that Guerin had "assaulted his airplane." Venticinque testified that he thought that Blais "wants to be a pilot, but he doesn't want to do what is necessary to acquire the license and do the proper practice lessons[.]" According to Venticinque, Blais "goes against the grain" and "likes to do things his way, which obviously isn't the right way."

Edouard DeCelles, however, provided a very different view of events. DeCelles testified that "[t]here is a group of people at this airport who don't like Mr. Blais. They just keep attacking him. He has been attacked enough that he just retaliated." According to DeCelles, Blais acted in the same manner in which DeCelles himself would have acted if confronted with the same situations that Blais had faced.

The hearing officer provided his report and recommendation to the director of RIAC in September 2015. The hearing officer found that all the witnesses who testified at the hearing were credible and he noted the concern that most of them had over Blais's alleged conduct. The hearing officer reported that Blais had demonstrated that he was unwilling to follow FAA regulations and that he was "contemptuous" of his comrades' concern for their safety and that of others. He found that Blais presented "an ongoing risk to himself and fellow pilots[,]" and therefore he recommended that the ban against Blais at North Central not be lifted.

On October 8, 2015, the director of RIAC sent a letter to Blais, purporting to be a final order, which stated:

> "I am writing to advise you that I have adopted the findings, conclusion and recommendations of [the hearing officer]. As such, you are directed to remain off the premises of North Central State Airport. This restriction applies only to the North Central State Airport. You may use any of the other Rhode Island Airport Corporation facilities, and may use North Central State Airport in the event of aviation emergency.
>
> "* * *
>
> "It is my intention to review this matter within six (6) months of today's date. I will request that [the hearing officer] reconvene the hearing and would welcome your participation. You will receive notice of the location, date and time of the hearing."

The order was signed by Kelly Fredericks, the director of RIAC, and attached to it was a document entitled "Notice of Appeal Rights of Party Aggrieved by Final Order of Director." The attached document informed Blais of his right to appeal RIAC's "final order" by the filing of a complaint in Superior Court within thirty days of the mailing of the order, in accordance with the Administrative Procedures Act.

On November 6, 2015, Blais did just that, filing a complaint in Superior Court that appealed RIAC's October 8, 2015 order, and seeking injunctive and declaratory relief.

Following briefing by the parties, the trial justice concluded that, although Blais was not entitled to injunctive or declaratory relief, neither the February 14, 2014 letter nor the October 8, 2015 order constituted a valid order because each had failed to comply with the statutory mandates set forth in the UARA. Specifically, she found that the February 14, 2014 letter failed to state the reasons for the order or provide the requirements that needed to be met before the order might be modified, as required for a final order by § 1-4-15. She also concluded that, because the October 8, 2015 order purported to extend the ban imposed by the February 2014 letter, which she had found to be invalid, it followed that the 2015 order was also invalid. Accordingly, the trial justice reversed the decision of RIAC, but denied Blais's requests for declaratory and injunctive relief.

RIAC petitioned this Court for the issuance of a writ of certiorari, which petition we granted on November 27, 2017.[5] Additional facts will be provided as necessary to resolve the issues raised in this review.

## II

## Standard of Review

When this Court reviews an administrative appeal brought under the Administrative Procedures Act, G.L. 1956 chapter 35 of title 42, our review is limited to questions of law. *Beagan v. Rhode Island Department of Labor and Training*, 162 A.3d 619, 625-26 (R.I. 2017). "This Court does not substitute its judgment for that of the agency concerning the credibility of

---

[5] The UARA provides that "[a]ny person against whom an order is entered may obtain a judicial review of that order under the provisions of chapter 35 of title 42." General Laws 1956 § 1-4-16. Accordingly, pursuant to G.L. 1956 § 42-35-15.1(a), anyone aggrieved by a final order of RIAC's director may seek review of that order by filing a complaint in Superior Court. Litigants may seek further review of a Superior Court judgment in an administrative appeal by petitioning this Court for a writ of certiorari within twenty days of the date that judgment was entered. Sections 42-35-15.1(b) and 42-35-16.

witnesses or the weight of the evidence concerning questions of fact." *Id.* at 626 (quoting *Tierney v. Department of Human Services*, 793 A.2d 210, 213 (R.I. 2002)). Although we afford great deference to the factual findings of the administrative agency, "questions of law— including statutory interpretation—are reviewed *de novo.*" *Iselin v. Retirement Board of Employees' Retirement System of Rhode Island*, 943 A.2d 1045, 1049 (R.I. 2008). Pursuant to § 42-35-15(g), when reviewing an administrative appeal, this Court may:

> "affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> > "(1) In violation of constitutional or statutory provisions;
> >
> > "(2) In excess of the statutory authority of the agency;
> >
> > "(3) Made upon unlawful procedure;
> >
> > "(4) Affected by other error or law;
> >
> > "(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
> >
> > "(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

We note that our "ultimate goal" when interpreting statutes "is to give effect to the purpose of the act as intended by the Legislature." *Providence Journal Company v. Rhode Island Department of Public Safety ex rel. Kilmartin*, 136 A.3d 1168, 1173 (R.I. 2016) (quoting *Webster v. Perrotta*, 774 A.2d 68, 75 (R.I. 2001)). In doing so, we look to the text of a statute because "it is well settled that the plain statutory language is the best indicator of the General Assembly's intent." *Twenty Eleven, LLC v. Botelho*, 127 A.3d 897, 900 (R.I. 2015) (brackets omitted) (quoting *Zambarano v. Retirement Board of Employees' Retirement System of State*, 61 A.3d 432, 436 (R.I. 2013)).

## Discussion

Before this Court, RIAC argues that it has the authority to ban an individual from any one of its airports without issuing a formal order if that individual poses a threat to airport safety or operations. In the alternative, RIAC argues that either the no-trespass letter issued by RIAC's attorneys on February 14, 2014 or the order issued by RIAC's director on October 8, 2015 may be considered a valid final order that complies with all statutory requirements. Finally, RIAC asserts that Blais's administrative appeal is time barred because Blais never appealed from the no-trespass letter issued in 2014.

### A

### Mootness

Before addressing the merits of this review, we first address the threshold issue of mootness. During oral argument in this case, the parties represented that, subsequent to the appeal of the 2015 order that is the subject of this review, RIAC issued a later order that lifted the ban and allowed Blais to again make use of the premises at North Central, and that that order had itself become the subject of ongoing litigation in other courts. To address potential mootness concerns raised by these representations, we issued a post-hearing order on April 4, 2019, directing the parties "to advise this Court, within five days of the date of this order, of any action pending in any other court that might directly or indirectly relate to this appeal, including the relief sought in those cases." Pursuant to that order, the parties submitted complaints filed by Blais in two separate actions: a 2016 administrative appeal in Superior Court, No. KC-2016-0724, and a 2017 civil action in the United States District Court for the District of Rhode Island, No. 1:17-cv-00075-S-LDA.

We previously have said that "[a]s a general rule we only consider cases involving issues in dispute; we shall not address moot, abstract, academic, or hypothetical questions." *Morris v. D'Amario*, 416 A.2d 137, 139 (R.I. 1980). "[A] case is moot if it raised a justiciable controversy at the time the complaint was filed, but events occurring after the filing have deprived the litigant of an ongoing stake in the controversy." *City of Cranston v. Rhode Island Laborers' District Council, Local 1033*, 960 A.2d 529, 533 (R.I. 2008) (quoting *Seibert v. Clark*, 619 A.2d 1108, 1110 (R.I. 1993)). In other words, "[a] case is moot if there is no continuing stake in the controversy, or if the court's judgment would fail to have any practical effect on the controversy." *Boyer v. Bedrosian*, 57 A.3d 259, 272 (R.I. 2012).

At first blush, RIAC's subsequent order allowing Blais to reenter North Central would seem to render our review of Blais's original administrative appeal moot, because RIAC is no longer preventing Blais from entering North Central. However, in each of the two complaints that were supplied to this Court in response to our April 4, 2019 order, Blais alleged that, while the case presently before this Court was pending, a second hearing was held by RIAC and that a hearing officer had recommended that "it is time that the 'No Trespass' order be removed – **but** his [Kevin Blais] status be reviewed again in six months." (Emphasis in original.) Both of those complaints concern a final order—which has not been transmitted to this Court as part of the record below and which is not currently before this Court for review—issued by the interim director of RIAC, Peter Frazier, on June 23, 2016, and which allegedly adopted the hearing officer's report and recommendation.[6]

In those complaints, Blais alleges that, although RIAC has again allowed him to use North Central, the agency has also attempted to retain jurisdiction over the present controversy

---

[6] The complaints that were provided to us pursuant to our order of April 4, 2019 do not explain what occurred after the expiration of that six-month review, or in the years since.

and that it has left the door open to again prohibiting his use of the airport after a subsequent six-month review. If Blais's allegations in those complaints are true, then his continued use of the airport remains subject to review by RIAC's director, and his status has in fact not returned to the status quo that existed before the 2014 no-trespass letter or the 2015 order were issued. Thus, our opinion on the merits of this appeal would indeed have a "practical effect on the controversy" currently on review and, therefore, the case before us at present is not moot. *Boyer*, 57 A.3d at 272. Accordingly, we shall proceed to consider the merits of RIAC's arguments on review.[7]

**B**

**G.L. 1956 § 1-4-15**

This case turns on our interpretation of the powers granted to RIAC under the UARA and, more specifically, the agency's power to issue orders "requiring or prohibiting certain things to be done" pursuant to § 1-4-15. That statute provides, in relevant part:

> "In any case where the director, pursuant to this chapter, issues any order requiring or prohibiting certain things to be done, the director shall set forth his or her reasons for the order and state the requirements to be met before approval is given or the rule, regulation, or order shall be modified or changed." Section 1-4-15.

Blais argued below, and the trial justice agreed, that RIAC is required to issue a formal order in accordance with § 1-4-15 to validly prohibit Blais from entering North Central. RIAC disagrees; it argues to this Court that control over entry onto its airports should more plausibly be considered a necessary function of its overarching responsibility to supervise and operate the

---

[7] Even if we were to hold this case to be moot, it may well have fallen into an exception to the mootness doctrine. *See Boyer v. Bedrosian*, 57 A.3d 259, 281 (R.I. 2012) (explaining that this Court will review otherwise moot issues if "the issues are of extreme public importance, which are capable of repetition but which evade review") (quoting *Campbell v. Tiverton Zoning Board*, 15 A.3d 1015, 1022 (R.I. 2011)).

state's airports and that RIAC therefore was acting within its authority when it directed its attorneys to issue the no-trespass letter prohibiting Blais from entering North Central. That argument is two-fold. First, RIAC argues that § 1-4-15 authorizes RIAC to issue only generally applicable orders in relation to its broader authority vis-à-vis aeronautical regulation, and that its control over ingress to and egress from its airports flows from the "penumbra" of powers implicit in its "supervision over aeronautics within the state, including: * * * [t]he * * * operation, and use of airports[.]"[8] Section 1-4-9(a)(1). Second, RIAC argues that compliance with the procedural requirements in § 1-4-15 and other sections of the UARA, discussed *infra*, would severely hinder its ability to react to time-sensitive threats to airport security and operations.[9] Neither of these arguments is persuasive.

First, we discern no support, in the UARA or elsewhere, for RIAC's argument that its authority to issue orders is limited to generally applicable aeronautical regulation. Aside from § 1-4-15, which governs "any order requiring or prohibiting certain things to be done," RIAC's authority to issue orders is mentioned in two other sections of the UARA: Sections 1-4-10 and 1-4-11.[10] Neither of those sections, either explicitly or implicitly, prevents RIAC from issuing orders that lie outside the realm of generally applicable aeronautical regulation. Section

---

[8] RIAC's authority to supervise and operate the various airport facilities in Rhode Island cannot be disputed. RIAC's authority in this area is reinforced by G.L. 1956 § 1-2-1(a), which provides that "[t]he director [of RIAC] has supervision over the state airport at Warwick and any other airports constructed or operated by the state[,]" and § 1-2-7.1(a), which recognizes that RIAC "has jurisdiction over the state airports and airport facilities, and the general assembly recognizes that the safe and efficient operation of the airports and airport facilities is of paramount importance to the citizens of the state of Rhode Island."

[9] RIAC also briefly argues that § 1-4-15 does not apply because "[t]he February 14 Letter generally prohibited Blais from entering North Central; it did not 'prohibit ***certain things*** to be done.'" We see utterly no merit in this argument. By purportedly prohibiting Blais from entering North Central, RIAC has attempted to set forth a "thing" which may no longer "be done" by Blais—namely, entering North Central. Section 1-4-15 therefore clearly applies.

[10] The ability to appeal from orders of RIAC's director, and issues related to such appeals, is also mentioned in §§ 1-4-16, 1-4-18, and 1-4-19.

1-4-10 requires RIAC's "orders governing aeronautics" to be "kept in conformity as nearly as may be with the federal legislation, rules, regulations, and orders on aeronautics," but does not prevent RIAC from issuing orders relating to other matters within its jurisdiction, such as the "safe and efficient operation of airports, airport facilities, and grounds." General Laws 1956 § 1-2-1(a). On the other hand, § 1-4-11, which relates to the acceptable methods of publicizing orders, plainly contemplates the issuance of orders "applying only to a particular person or persons[.]" Section 1-4-11(b). Moreover, although we agree that the normal incidents of operating and supervising the airports in this state, pursuant to § 1-4-9, may be accomplished without resort to a multitude of formal orders, we do not believe that the indefinite ban RIAC has purportedly imposed here can be plausibly classified as a normal incident of operation. Consequently, we conclude that RIAC's authority to issue orders "requiring or prohibiting certain things to be done," § 1-4-15, is not limited to generally applicable matters concerning aeronautical regulation.

We are similarly unpersuaded by RIAC's argument that the procedural requirements attendant to a formal order would hamstring its efforts to protect the safe and secure operation of its airports. Indeed, RIAC has unquestionable "authority to make arrests for violation of the statutes, laws, rules, and regulations relating to aviation and airport security matters[.]" Section 1-4-14(b). That authority no doubt includes the lesser authority to temporarily eject persons from any airport, without issuing a formal order, for behavior that poses an immediate disturbance or pressing threat.[11] *Id.*; *see Perrotti v. Solomon*, 657 A.2d 1045, 1048 (R.I. 1995) (holding that the state retirement board's enabling legislation, which endowed the board with the

---

[11] In addition, there is nothing in the statutory framework that would prohibit RIAC from seeking injunctive relief in the Superior Court in appropriate circumstances.

authority to "administer" and "operate" the retirement system, provided "sufficiently broad" authority to decide matters not explicitly provided for elsewhere in the statute).

However, it is significant that RIAC has not alleged that Blais violated any law or regulation, and, even though RIAC characterizes Blais's behavior as a threat to airport safety, it does not advance any argument that any potential menace was pressing or time-sensitive to the extent that might justify circumventing the procedural requirements the General Assembly has imposed on the issuance of a formal order.[12]

In short, we conclude that RIAC's authority to issue orders "requiring or prohibiting certain things to be done" pursuant to § 1-4-15 is not limited to generally applicable aeronautics regulation. Thus, it is our opinion that an order issued by RIAC's director pursuant to § 1-4-15 is the exclusive means of permanently barring an individual from entering onto an airport in RIAC's jurisdiction.[13] We therefore reject RIAC's argument that it may bar an individual from an airport in its jurisdiction by means of a no-trespass letter issued through counsel.

## C

### Formal Order

Having determined that RIAC may permanently prohibit an individual from entering its airports only by issuing a formal order, we now turn our attention to an examination of the communications RIAC sent to Blais to determine whether any of them might plausibly be

---

[12] What is more, if RIAC was truly convinced that Blais's behavior was a time-sensitive threat to security warranting circumvention of the UARA's procedural requirements, it is difficult to understand why, in its 2015 order prohibiting Blais from entering North Central, RIAC expressly allowed Blais to "use any of the other Rhode Island Airport Corporation facilities[.]"

[13] Blais argues that a litany of constitutional concerns is raised by orders prohibiting individuals from entering onto public airports. The trial justice did not reach those issues and, because we affirm the judgment of the Superior Court on statutory grounds, we need not, and shall not, consider Blais's constitutional concerns. *See In re Brown*, 903 A.2d 147, 151 (R.I. 2006) ("Neither this Court nor the Superior Court should decide constitutional issues unless it is absolutely necessary to do so.").

considered a formal order and whether either the communication of February 2014 or of October 2015 complied with the procedural requirements of § 1-4-15. First, however, we must describe the procedural requirements that must be met before a formal order prohibiting Blais's access to North Central may be enforced.

Section 1-4-15 provides that RIAC's director may issue an order "requiring or prohibiting certain things to be done[.]" However, § 1-4-15 also provides that, before such orders may be enforced, "the director shall set forth his or her reasons for the order and state the requirements to be met before approval is given or the rule, regulation, or order shall be modified or changed." Additional procedural requirements are found elsewhere in the UARA. Section 1-4-11(b) provides that "[e]very order applying only to a particular person or persons named in it shall be mailed to, or served upon, that person or persons" and § 1-4-11(c) requires that all orders "adopted by the director shall be kept on file with the secretary of state."[14] To summarize, RIAC's director may issue an order "applying only to a particular person or persons," § 1-4-11(b), which "require[s] or prohibit[s] certain things to be done," § 1-4-15, if the following

_____

[14] RIAC contends that any formal order it issued would also need to meet the requirements of § 1-4-11(a), which provides:

> "Every general rule, regulation, and order of the director shall be posted for public inspection in the main aeronautics office of the director at least five (5) days before it becomes effective, and shall be given any further publicity, by advertisement in a newspaper or otherwise, as the director deems advisable."

RIAC argues that such a posting requirement would render impractical, and potentially unsafe, any attempt to prohibit a dangerous person's entry onto the premises of an airport by way of a formal order. We disagree. Section 1-4-11(a), by its terms, applies to "[e]very *general* rule, regulation, and order[.]" (Emphasis added.) In contrast, § 1-4-11(b) governs "[e]very order applying only to a particular person or persons[.]" We conclude that, by including the word "general" in § 1-4-11(a), the General Assembly intended the posting requirement to apply only to generally applicable rules, regulations, and orders and not to personal orders that apply only to particular persons and for which § 1-4-11(b) governs the applicable notice requirements.

procedural requirements are met: (1) that the order "be mailed to, or served upon, that person or persons," § 1-4-11(b); (2) that it "be kept on file with the secretary of state," § 1-4-11(c); (3) that the director "set forth his or her reasons for the order," § 1-4-15; and (4) that the director "state the requirements to be met before approval is given or the * * * order shall be modified or changed," § 1-4-15.

RIAC issued, or caused to be issued, two communications that would have prevented Blais from entering North Central, if either or both were found to be a formal order that was in compliance with the procedural requirements just mentioned—the original no-trespass letter issued by RIAC's attorneys on February 14, 2014, and the director's order of October 8, 2015, which adopted the hearing officer's recommendation that RIAC not lift the ban purportedly imposed by the 2014 no-trespass letter.

The trial justice found that the 2014 no-trespass letter was not enforceable because it failed to set forth the reasons for the order and further that it "did not state the requirements that needed to be met for purposes of modifying or changing the purported ban[.]" We completely agree, and add that the three sentence letter was not signed by RIAC's director, did not provide any statutory basis or authority for banning Blais from North Central, and did not hold itself out as a formal order of RIAC's director.

The October 8, 2015 order demands a different analysis.[15] The trial justice concluded that the October 2015 order was invalid because it merely purported to extend a ban established by the 2014 no-trespass letter, which the trial justice also had found to be invalid. Although we agree with the reasoning of the trial justice that RIAC could not extend a ban that was not valid

---

[15] Unlike the 2014 no-trespass letter, the 2015 order had several hallmarks of a formal order. It was signed by Kelly Fredericks, the director of RIAC, was mailed to Blais's home address in compliance with § 1-4-11(b), and included a notice of Blais's right to appeal, which referred to the communication as a "final order."

- 17 -

in the first place, we believe the 2015 order might also be viewed as an independent source of the prohibition on Blais's entry onto North Central because that order "directed [Blais] to remain off the premises of North Central State Airport."

Nevertheless, even were we to assume that the 2015 order is an independent source of the ban, it could not be enforced because it also did not comply with the procedural requirements of the UARA. By stating in the order that the director had "adopted the findings, conclusion and recommendations of [the hearing officer,]" RIAC's director arguably "set forth his or her reasons for the order," § 1-4-15, by incorporating the hearing officer's report and recommendation by reference.[16] We need not decide whether such incorporation was permissible, however, because the director did not in any way "state the requirements to be met before approval is given or the * * * order shall be modified or changed." Section 1-4-15. This, in our opinion, is a fatal flaw.

RIAC argues that § 1-4-15 merely requires the director to state the "requirements to be met" in situations where RIAC would need approval from some other entity before modifying or changing an order. We disagree. The relevant language of § 1-4-15 provides that "[i]n any case where the director, pursuant to this chapter, issues any order requiring or prohibiting certain

---

[16] Blais argued before the hearing officer, and implied in his brief to this Court, that the administrative hearing held in June 2015 was not authorized by law because "[t]he Notice of Hearing did not comply with Rhode Island open meeting notice requirements set forth in R.I. Gen. Laws § 42-46-6." He seems to argue that his opportunity to cross-examine the witnesses at the hearing belied the purported nature of the hearing as an "open meeting/public hearing." Blais also takes issue with the location of the hearing, as it was "at the one and only location, North Central State Airport, where RIAC had purportedly banned [him] from accessing." Despite those clamorous protests, Blais does not identify for our review a single requirement that was not met, nor error that was made, in arranging or holding the June 2015 hearing, and he cites no caselaw in support of his apparent dissatisfaction with the hearing process. Because we affirm the decision of the Superior Court, we need not and do not consider Blais's undeveloped argument regarding the propriety of the Notice of Hearing or the June 2015 hearing itself. We do observe, however, that the UARA gives the director of RIAC "the power to conduct investigations, inquiries, and hearings concerning matters covered by the provisions of [the UARA] and accidents or injuries incident to the operation of aircraft occurring within this state." Section 1-4-12.

- 18 -

things to be done, the director shall * * * state the requirements to be met before approval is given or the rule, regulation, or order shall be modified or changed." The statute clearly provides that the director *shall* provide the requirements to be met "in *any* case" where the director issues "*any* order" that requires or prohibits certain things to be done.

We are similarly unmoved by RIAC's urging that "requiring RIAC to forecast what conditions would enable it to lift the ban is impractical[,]" as such a requirement "presupposes that such conditions could be identified" in the first place. However, even if such forecasting is impractical or difficult, it is what the statute requires. As we have said recently, "[i]t is not for this Court to determine whether a statute enacted by the General Assembly 'comports with our own ideas of justice, expediency or sound public policy.'" *State v. LeFebvre*, 198 A.3d 521, 527 (R.I. 2019) (brackets omitted) (quoting *State v. DiStefano*, 764 A.2d 1156, 1160 (R.I. 2000)). This is so because "[w]here the General Assembly has lawfully enacted a statute whose terms are clear and unambiguous, 'the task of interpretation is at an end and this Court will apply the plain and ordinary meaning of the words set forth in the statute.'" *Id.* at 527-28 (brackets omitted) (quoting *State v. Marsich*, 10 A.3d 435, 440 (R.I. 2010)).

We conclude, therefore, that neither the 2014 no-trespass letter nor the 2015 order constituted a valid formal order because neither complied with the UARA's procedural requirements for an order "requiring or prohibiting certain things to be done." Section 1-4-15.

## D

### The Timely Appeal

We are similarly unconvinced by RIAC's argument that Blais failed to timely appeal RIAC's decision to ban him from North Central because Blais "*never* appealed the February 2014 letter." The UARA provides that anyone aggrieved by an order issued by RIAC may

obtain judicial review under the provisions of the Administrative Procedures Act.  *See* § 1-4-16.

Under the Administrative Procedures Act, a complaint must be filed in Superior Court "within

thirty (30) days after mailing notice of the final decision of the agency[.]"  Section 42-35-15(b).

Unfortunately, RIAC's focus on the 2014 no-trespass letter is misplaced.  We agree with

the trial justice that the 2014 letter was not a final order.  Blais did, however, bring an

administrative appeal from the 2015 order, characterized by the agency as a "final order," within

thirty days of its issuance.  We thus brush aside RIAC's argument on this issue and easily

conclude that Blais's administrative appeal was timely made.

Therefore, having concluded that Blais's administrative appeal was timely made and that

a formal order is the exclusive means by which RIAC may permanently prohibit an individual's

entry onto any airport in its jurisdiction, and after further concluding that neither the 2014 no-

trespass letter nor the 2015 order complied with the procedural requirements of an order

"requiring or prohibiting certain things to be done[,]" it is the opinion of this Court that the

judgment of the Superior Court reversing RIAC's order banning Blais from North Central was

correct.

## IV

### Conclusion

For the reasons stated herein, the judgment of the Superior Court is affirmed.  The papers

in this case are remanded to the Superior Court with our decision endorsed thereon.


**Justice Robinson, dissenting in part and concurring in part.**  I respectfully, but very

vigorously, dissent from the majority opinion's analysis and conclusion with respect to mootness

in this challenging case.  Contrary to the determination of the majority, it is my opinion that this

case is absolutely moot and that we as a Court should not issue what amounts to an advisory opinion. In my judgment, the presence of mootness should end our consideration of this case.

However, given that the majority has chosen to delve into the merits of the case, I likewise feel obliged to comment on some of the substantive aspects of the Court's opinion— without, however, retreating from my position that the appeal is moot and that this Court should not so very unnecessarily be sailing into uncharted and potentially hazardous waters. I am able to concur in the majority's holding that "an order issued by [the Rhode Island Airport Corporation's (RIAC)] director pursuant to [G.L. 1956] § 1-4-15 is the exclusive means of *permanently* barring an individual from entering onto an airport in RIAC's jurisdiction." (Emphasis added.) But, while I concur in that holding, I wish with all due respect to emphatically state my opinion that the director of RIAC (or his or her delegate) has the authority to *temporarily* bar an individual from airport property without having to issue a formal order pursuant to § 1-4-15.

## A

### Mootness

I begin by addressing the issue of mootness. "As a general rule, the Supreme Court will only consider cases involving issues in dispute; [it] shall not address moot, abstract, academic, or hypothetical questions." *Campbell v. Tiverton Zoning Board*, 15 A.3d 1015, 1022 (R.I. 2011) (internal quotation marks omitted). This Court has held that "a case is moot if the original complaint raised a justiciable controversy, but events occurring after the filing have deprived the litigant of a continuing stake in the controversy." *Hallsmith-Sysco Food Services, LLC v. Marques*, 970 A.2d 1211, 1213 (R.I. 2009) (internal quotation marks omitted); *see also Boyer v. Bedrosian*, 57 A.3d 259, 272 (R.I. 2012). In this case, it was represented at oral argument before

this Court that RIAC has issued an order lifting the ban on Mr. Blais's access to the North Central State Airport. In my judgment, that simply ends the inquiry. There is no relief that we are able to afford Mr. Blais at this time. *See Hallsmith-Sysco Food Services, LLC*, 970 A.2d at 1213 ("This Court will not decide a question if it would fail to have a practical effect on an actual controversy."); *see also H.V. Collins Co. v. Williams*, 990 A.2d 845, 847 (R.I. 2010) ("It is well settled that a necessary predicate to this Court's exercise of jurisdiction is an actual, justiciable controversy."); *Cicilline v. Almond*, 809 A.2d 1101, 1106 (R.I. 2002) (stating that the Court will not adjudicate a moot case because "whenever a court acts without the presence of a justiciable case or controversy, its judicial power to do so is at its weakest ebb") (internal quotation marks omitted). This appeal should simply be dismissed as moot. I consider it to be unwise and inconsistent with this Court's traditional jurisprudence to venture where it is not necessary to go.

I am not in the least persuaded by the majority's reference to the complaints pending in the Rhode Island Superior Court and the United States District Court for the District of Rhode Island, which reference is accompanied by the unstated assumption that the mere pendency of those cases in other courts somehow renders this case something other than moot. It is clear to me that the mere existence of those other cases does not transmogrify this case into a justiciable controversy. *See H.V. Collins Co.*, 990 A.2d at 847. What is more, the majority bases its mootness decision on the purported existence of an order which allegedly stated that Mr. Blais's status would be reviewed by RIAC in six months from the issuance of that purported order; but the majority candidly acknowledges that *we have no such order in the record before us in this case*. I cannot countenance arriving at a determination that the case is not moot on the basis of mere speculation, based on complaints filed in other courts and a purported order that is not part

of the record. The reality of the situation with which we are presented is that, based on the record that is actually before us, there is no actual case or controversy on which a decision of this Court could have a practical effect. *See Hallsmith-Sysco Food Services, LLC*, 970 A.2d at 1213; *see also H.V. Collins Co.*, 990 A.2d at 847; *City of Cranston v. Rhode Island Laborers' District Council, Local 1033*, 960 A.2d 529, 533 (R.I. 2008). Consequently, I am of the unshakable opinion that, if this case is not moot, I simply do not know what case would be.[1] While my respect for the author of the majority opinion and for the Court is real, I fear that a major mistake is being made by not simply stopping at the mootness inquiry. To my mind, there is great wisdom in the frequently quoted remark of Shakespeare's Falstaff: "The better part of valor is discretion * * *." William Shakespeare, The First Part of King Henry the Fourth, act 5, sc. 4.

## B

### The Merits

Although I feel very strongly that the determination of mootness should end this Court's consideration of this case, I feel duty-bound to express my thoughts with respect to the remaining substance of the majority opinion. After considerable reflection,[2] I ultimately agree with the

---

[1] I acknowledge that this Court has recognized that "[o]ne narrow exception to the mootness doctrine exists for those cases that are of extreme public importance, which are capable of repetition but which evade review." *Hallsmith-Sysco Food Services, LLC v. Marques*, 970 A.2d 1211, 1214 (R.I. 2009) (internal quotation marks omitted). "For a matter to be deemed of extreme public importance, it will usually implicate important constitutional rights, matters concerning a person's livelihood, or matters concerning citizen voting rights." *City of Cranston v. Rhode Island Laborers' District Council, Local 1033*, 960 A.2d 529, 533-34 (R.I. 2008) (internal quotation marks omitted). In my opinion, the invocation of the exception would not be appropriate in this case since we are not confronted with an issue of extreme public importance as defined in our case law.

[2] I wish to emphasize that, while I now intellectually assent to the majority's interpretation of the statutory scheme at issue, I did not reach that conclusion because the answer was self-evident or immediately clear to me. In view of the absence of controlling precedent and bearing in mind the historical reality of the need for safety and security in our airports, it was only with difficulty that I acceded to the majority's reasoning. I do not believe that we should elevate

- 23 -

majority's holding that "an order issued by RIAC's director pursuant to § 1-4-15 is the exclusive means of *permanently* barring an individual from entering onto an airport in RIAC's jurisdiction."[3] (Emphasis added.) However, I wish to clearly state that I am of the definite opinion that the director of RIAC (or his or her delegate) undoubtedly has the authority to *temporarily* bar an individual from an airport (or indeed all airports) under the director's jurisdiction without issuing a formal order pursuant to § 1-4-15. Any ruling to the contrary would be, in my opinion, a serious threat to airport security in this state.

In spite of my agreement with what I understand to be the holding of the majority as to the permanent barring of individuals, I feel compelled to express my view relative to the following sentence in the majority opinion which I find troubling:

> "We therefore reject RIAC's argument that it may bar an individual from an airport in its jurisdiction by means of a no-trespass letter issued through counsel."

To begin, this sentence seems to me to create some confusion, in spite of what the majority says elsewhere in its opinion, as to the issue of whether or not the director has the power to temporarily bar individuals from airports in this state by issuing a no-trespass letter. I

administrative formalism over the need to protect the health and safety of those who use our airports.

For the same reason, I do not entirely fault the director for the remedial action that he took vis-à-vis Mr. Blais, even if he did not use the correct means in so doing. (The majority opinion nicely narrates the troubling provocations that resulted in the decision to ban Mr. Blais from the North Central State Airport.) Notably, the director lacked the legal guidance that today's majority opinion provides; and, although I concur in the majority's judgment with respect to the action that he took in response to those provocations, I would caution against being too quick to judge him too harshly in a Monday morning quarterbacking fashion. Due process is an important value, but it is not the only important value; there is wisdom in the ancient maxim, *salus populi suprema lex*. (The well-being of the citizenry is the highest law.) *See Beer Co. v. Massachusetts*, 97 U.S. 25, 33 (1877).

[3] I deem it worth noting that I also concur in the conclusion reached by the majority in Part III.C of its opinion that the communications at issue sent to Mr. Blais did not constitute valid formal orders because they did not comply with the dictates of G.L. 1956 § 1-4-15 and other relevant statutory sections.

acknowledge that the letters at issue in this case involved a permanent barring of Mr. Blais, but the issue of the scope of the director's power in this area is important enough that I feel compelled to make my view known.

The RIAC director, by statute, is tasked with the supervision of the airports of this state, including the "operation[ ] and use" of those airports. General Laws 1956 §§ 1-2-1(a); 1-4-9(a)(1). The director is further charged with promulgating rules and regulations "for the safe and efficient operation of airports, airport facilities, and grounds." Section 1-2-1(a). The General Assembly has further specifically granted RIAC "jurisdiction" over the airports in this state, and it has expressly indicated that it "recognizes that the safe and efficient operation of the airports and airport facilities is of paramount importance to the citizens of the state of Rhode Island." Section 1-2-7.1(a).

In addition, I would also note that the General Assembly has stated that the RIAC director "shall adopt and promulgate, and may amend or repeal, rules and regulations establishing minimum standards with which all air navigation facilities * * * must comply, and shall adopt and enforce, and may amend or repeal rules, regulations, and orders, to safeguard from accident and to protect the safety of persons operating or using aircraft and persons and property on the ground * * *." Section 1-4-10. The director also "has the power to conduct investigations, inquiries, and hearings concerning matters covered by the provisions of this chapter and accidents or injuries incident to the operation of aircraft occurring within" Rhode Island. Section 1-4-12.

In my opinion these statutes represent a broad statutory authority granted to RIAC and its director to govern the airports of this state. Any argument that a *temporary* barring of an individual from an airport in this state for good cause must be done by formal order and,

therefore, must meet all of the statutory requirements discussed in Part III.C of the majority opinion would be misguided; it would be, at best, an instance of putting form over substance. *See generally New Harbor Village, LLC v. Town of New Shoreham Zoning Board of Review*, 894 A.2d 901, 905 (R.I. 2006) (declining to put form over substance and citing other cases similarly declining to do so). In my view, it is absolutely imperative that the director, as a result of the broad statutory authority granted to him or her, have the authority to deal with dangerous and time-sensitive security or general welfare issues of a developing nature without engaging in an administrative process that could be characterized as cumbersome. *See Peak v. United States*, 353 U.S. 43, 46 (1957) ("That seems to us to be the common sense of the matter; and common sense often makes good law."). In my opinion, the director's statutory authority is sufficiently broad to encompass such a situation. *See Perrotti v. Solomon*, 657 A.2d 1045, 1048 (R.I. 1995) (holding that the enabling legislation for the state's retirement board was "sufficiently broad so as to include the retirement board's administrative authority to determine pension eligibility" even when that authority was not specifically mentioned in the statute); *Cardenas v. Cardenas*, 478 A.2d 968, 970 (R.I. 1984) (holding that the Family Court's "grant of power by [G.L. 1956] § 8-10-3 [was] sufficiently broad to include the issuing of a restraining order against a third person in order to reach and apply an asset in the hands of that third person in implementation of an order for support"). As such, it is my belief that the statutory scheme with which we are now confronted certainly provides the RIAC director with the authority to temporarily eject or bar someone from an airport under his or her supervision by use of a no-trespass order. I am, however, able to agree with what I understand the holding in the majority opinion to be—*i.e.*, that, in order to *permanently* bar someone from an airport that is under the director's supervision,

the director must issue a formal order pursuant to § 1-4-15, which order must then comply with the relevant statutory requirements.

**C**

**Conclusion**

Accordingly, I must record my respectful, but very vigorous, dissent from the opinion of the majority with respect to the issue of mootness. I concur in the remaining portions of the majority opinion—except that I believe that the director's authority to temporarily bar an individual from a state airport is worthy of additional emphasis.

STATE OF RHODE ISLAND AND JUDICIARY RHODE ISLAND Justice Independence Honor PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Kevin M. Blais v. Rhode Island Airport Corporation et al. |
| **Case Number** | No. 2017-326-M.P.<br>(PC 15-4893) |
| **Date Opinion Filed** | June 20, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Sarah Taft-Carter |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Kevin C. Cain, Esq. |
| | For Defendants:<br><br>Matthew C. Reeber, Esq.<br>Patrick J. McBurney, Esq. |